**E-FILED**
Friday, 08 May, 2015  11:34:44 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CENTRAL ILLINOIS

| | |
|---|---|
| JANE DOE[1],            ) | |
|            ) | |
|       Plaintiff     ) | |
|            ) | Civil Action No.: |
|     v.         ) | |
|            ) | |
| SOUTHERN ILLINOIS UNIVERSITY,   ) | |
| SOUTHERN ILLINOIS UNIVERSITY   ) | |
| SCHOOL OF MEDICINE, and     ) | |
| SOUTHERN ILLINOIS UNIVERSITY   ) | |
| SCHOOL OF MEDICINE at CARBONDALE   ) | |
|            ) | |
|       Defendants   ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Jane Doe, by and through her attorney, Richard Fedder, and issues this Complaint against the Defendant Southern Illinois University ("SIU") and its administrative sub-units Southern Illinois University School of Medicine ("SIU-SOM") and Southern Illinois University at Carbondale School of Medicine ("SIUC-SOM").

Plaintiff Doe requests that this Court permit her to excercise her right to a jury trial.

---

[1]    The Plaintiff intends to file a separate Motion asking that the Court permit her to proceed as Jane Doe.

**SUMMARY**

This cause of action arises from: (a) the prolonged sexual harassment and stalking of Plaintiff Doe by her Medical School Professor, which put her in fear for her physical safety and made it difficult for her to attend, study, and perform in class; (b) the subsequent failure of Defendants' representatives to investigate that behavior or otherwise respond in a manner to protect Doe, despite repeated attempts by Doe to seek help; and (c) the ultimate retaliation by some of Defendants' representatives against Doe for raising and continuing to pursue complaints. The combined actions of Defendants' representatives – sexual harassment and stalking, failure to investigate and respond appropriately, and concerted acts of retaliation against Doe – together created a hostile environment for her at the Medical School, in violation of Title IX, causing her severe emotional distress and ultimately preventing her from obtaining a medical degree.

## I. JURISDICTION AND VENUE

A. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (granting district courts jurisdiction over all cases arising from the Constitution, laws, and treaties of the United States) and 28 U.S.C. § 1343 (granting district courts original jurisdiction over any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights).

B. Doe brings this action pursuant to Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681(a)), which is an Act of Congress providing for protection of civil rights. Because Defendant is a state institution, the Fourteenth Amendment is also implicated.

C. The Defendants are institutions of the State of Illinois, who are recipients of federal aid, in the sense intended by Title IX. Therefore, as a matter of law, the Defendants have waived the right to plead immunity under the Eleventh Amendment.

D. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), in that the principal Defendant, Southern Illinois University School of Medicine, has its main headquarters in Springfield, Illinois, and two of the Defendants' representatives implicated in this case reside and work in

Springfield.  In addition, pursuant to § 1391(b)(2), certain key actions relating to Defendants' failure to investigate took place in Springfield, Illinois.

## II.  THE PARTIES

1. SIU is a University in the State University system of Illinois.  It has several campuses, of which the two that are relevant herein are the Carbondale campus ("SIUC") and the Springfield campus ("SIUS").

2.  SIU-SOM is an accredited four year program for training doctors.  Medical students take their first year of training at SIUC, and the next three years at SIUS.

3. SIUC-SOM is a subunit of SIU-SOM, and provides the first year of medical education to all SIU-SOM students.

4. Jane Doe was a medical student at SIU-SOM for the academic years 2011-12 and 2012-13.

## III.  GENERAL ALLEGATIONS WITH REGARD TO APPLICABLE LAW AND POLICY

5.  Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any activity receiving Federal financial assistance. . .

6.  Title IX is implemented through the Code of Federal Regulations, 34 C.F.R. part 106. 34 C.F.R. § 106.8(a) provides:

> Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address, and telephone number of the employee or employees appointed pursuant to this paragraph.

34 C.F.R. § 106.8(b) goes on to provide:

> . . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

8.  To clarify the provisions above, 34 C.F.R. § 106.2(i) defines *recipient* to be:

> . . . any State or political subdivision thereof, or any instrumentality of a
> State or political subdivision thereof, any public or private agency,
> institution, or organization, or other entity, or any person, to whom
> Federal financial assistance is extended . . . and which operates an
> education program or activity which receives such assistance, including
> any subunit, successor, assignee, or transferee thereof.

And 34 C.F.R. § 106.2(g) defines *federal financial assistance* to include any funds made available for:

> (1) A grant or loan of Federal financial assistance, including funds made
> available ["under a law administered by the Department [of Education]"]
> for:
>
> > (i) The acquisition, construction, renovation, restoration, or repair
> > of a building or facility or any portion thereof; and
>
> > (ii) Scholarships, loans, grants, wages or other funds extended to
> > any entity for payment to or on behalf of students admitted to that entity,
> > or extended directly to such students for payment to that entity.

9.  At all material times, SIU, and in particular SIU-SOM, together with its subunits SIUC-SOM and SIUS-COM received federal funding and financial assistance in support of the education and training of (medical) students.

10.  As a result, Southern Illinois University; its School of Medicine, as subunit; and both of the campuses of its School of Medicine, as subunits, are all *recipients* in the sense of Title IX.

11.  In *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the Supreme Court held that Title IX gives individuals a private right of action.  In *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 71-76*,* (1992) the Supreme Court held (and explained) that monetary damages of all types are available to a plaintiff under Title IX in cases of intentional discrimination.

12.  In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds *intentionally* violates Title IX, and is subject to a private action for damages, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

13.  In *Jackson v. Birmingham Bd. Of Ed.,* 544 U.S. 167 (2005), the Supreme Court recognized a private right of action under Title IX for acts of retaliation, triggered by the plaintiff's opposition to acts which are prohibited by Title IX.  A plaintiff must initially show: "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse . . . action; and (3) that there is some causal relation between the two events."  *Id*. at 173-74, 184.

14.  Plaintiff Doe alleges that SIU, its School of Medicine, and in particular its Carbondale campus, failed to adopt and/or failed to publish to its medical students an appropriate set of procedures (pursuant to 34 C.F.R. § 106.8(b)) governing teacher-student sexual harassment; and in any event, made no effort to implement such procedures in Doe's case, despite her repeated complaints and pleas for help, which were made to various University officials.

15.  In addition, Doe alleges that SIU, its School of Medicine, and in particular its Carbondale campus, failed to identify a specific Title IX enforcement officer, or else failed to inform medical students (pursuant to 34 C.F.R. § 106.8(a)) of the name and contact information for said enforcement officer to receive student complaints about sexual harassment (especially as committed by a professor), hostile environment, or other violations of Title IX.

16.  Doe alleges that she made various attempts, over the course of more than a year, to inform SIU-SOM officials at both the Carbondale and Springfield campuses about her allegations of sexual harassment, hostile environment, and the retaliatory actions and continuing hostile environment that followed therefrom.

17.  However, Doe further alleges Defendants showed "deliberate indifference" to her allegations, in that: (a) they failed to promulgate any policy to address sexual harassment by professors against students; (b) they failed to designate a specific officer and/or failed to notify students who had been designated as specific officer to receive complaints and enforce the policies of Title IX; (c) they failed to train their personnel in how to handle and respond to complaints by students under Title IX alleging sexual harassment by professors; (d) they initially stonewalled and ignored Doe's complaints; (e) they subsequently failed to conduct meaningful investigations into her complaints; (f) they then failed to take any remedial actions either to mitigate the hostile environment Doe experienced, or to

protect her from retaliation; (g) and ultimately retaliated by rigging their procedures to ensure that she would flunk out of school.

## IV.  FACTS AND BACKGROUND

### A. Jane Doe's personal history

18. Doe was born in 1977.

19. She graduated from High School in May 1995, first in her class.

20. She then attended a prestigious East Coast liberal arts College, graduating in 1999 with a degree in Economics.

21. Doe married Dustin F. in August 2006.  Her son Jack was born at the end of June 2007.  She and Dustin F. divorced in January 2010.

22. After college, Doe was recruited by the Wall Street firm Warburg Dillon Read (later known as "UBS AG"). She began her career as an analyst in the Healthcare Investment Banking Department, and then was promoted (rapidly) from Analyst to Associate to Associate Director.

23. After four years at UBS, Doe followed her boss to launch a new healthcare investment banking group at Friedman, Billings, Ramsey & Co.  She worked there for three years.

24. For the last full calendar year of 2005, she earned approximately $230,000.

25. However, Doe's dream was to become a doctor.  In 2006, she applied and was accepted to the post-baccalaureate premedical program at Washington University in St. Louis.

26. In August 2006, she began taking basic post-baccalaureate classes in science – physics, general chemistry, organic chemistry, and biology, and then more advanced courses, such as in biochemistry and graduate level genetics.  The entire program took two years to complete.

27. In 2007, Doe had a baby, and in 2008 she began a process of divorce, which caused her to delay her plans for medical school.

28. In 2010, Doe took the Medical College Admission Test ("MCAT"), required for admission into medical school, and considered to be a very good statistical predictor of success.

29. Doe scored a 29 overall on the MCAT.  She was consistently solid in all three areas of the test (10 in Biological Sciences; 10 in Physical Sciences; 9 in Verbal Reasoning).  This placed her in the top 25% to 30% of all students nationwide who sat for the 2010 MCAT.

30. Doe's divorce agreement gave her primary custody of her son, Jack. But it also required her to live near Dustin F. to enable him to participate in parenting.  She agreed to domicile Jack within 45 miles of the St. Louis Arch.   As a practical result, and notwithstanding her strong MCAT scores, Doe could only apply to a handful of medical schools in St. Louis and Illinois.

31. With that constraint in mind, Doe applied to SIU-SOM, and was admitted there, matriculating in August 2011.

32. At the time, she was 34 years old.  This made her the oldest female student in her entering class.  Doe was also the only (single) mother in her entering class.

33. While attending medical school, Doe maintained a residence in Collinsville with her son. Because it was a two-and-a-half hour commute to SIU-SOM, she took on a second residence in Carbondale, to use when Jack was in the care of her parents or her ex-husband.

## V. EDUCATIONAL PRACTICES AT SIU-SOM

### A. Diagnostic Exams

34. On Doe's first day of medical school, in August 2011, all of the entering students at SIUC-SOM took a diagnostic exam.  This diagnostic exam was adopted and administered by a consortium of seven regional medical schools.   It was designed to assess the preparedness of entering medical students, and considered to be a strong predictor of success in medical school.

35. The test was graded separately with respect to two skill/aptitude categories – (a) diagnostic pattern recognition; and (b) clinical pattern interpretation.  Doe performed extremely well in both categories, scoring a 99 percentile in one and an 88 percentile in the other.

37. Doe took the exam again in August 2012, this time scoring a 99 and 92 percentile.

38. Taken together, Doe's solid performance on the MCAT (administered nationwide) and on the diagnostic exam (administered by these seven cooperating schools) constituted a very strong predictor that Doe would do well in medical school.

### B. Pedagogy

39. Students at SIU-SOM spend their first year attending classes at the school's Carbondale campus, SIUC-SOM.  During that time, they study the so-called "basic sciences" (focusing on human physiology, biochemistry, anatomy/physiology, pharmacology, and (to a lesser extent) histology), while

simultaneously receiving training in so-called "clinical skills" (how to conduct a physical examination of a patient, make a diagnosis, and prescribe a treatment).

40. The students then go to Springfield, SIUS-SOM, for the remaining three years of medical school.  The training at SIUS-SOM consists of one more year of study in the basic sciences (focusing on pathology, microbiology, immunology, and pharmacology), with simultaneous continued training in clinical skills; followed by two years spent in internship and clinical rotations in a hospital setting.

41. The first year curriculum at SIUC-SOM is divided chronologically into three units (*i.e.,* trimesters).  Each unit focuses on a different set of organ systems within the human body.

42. The first unit addresses organ systems primarily responsible for cardiological, renal, and respiratory functions (hereinafter "CRR").  This unit runs from August to December.

43. The second unit addresses sensorimotor systems and behavior (hereinafter "SSB"), more commonly called neuro-anatomy and neuro-physiology.  It runs until the end of March.

44. The third unit addresses endocrine, reproductive, and gastrointerological organ systems (herinafter "ERG").  It runs from April until June.

45. Each unit, in turn, is divided into two main areas of learning – (1) basic sciences (which includes hands-on examination of a cadaver in anatomy lab and lectures from professors on the organ systems being studied) and (2) clinical skills.  These learning areas are coordinated with each other, and correlated to the main subject matter of that particular unit – CRR, SSB, or ERG – using a pedagogical methodology known as "Problem Based Learning" ("PBL").  This methodology focuses on giving students problems to solve, while de-emphasizing the traditional lecture-based pedagogy used by the majority of medical schools.

46. Students address these problems in so-called "Tutor Groups".  The Tutor Groups are designed to tie clinical skills together with the basic science and anatomy lessons.

47. At the beginning of each unit, SIUC-SOM assigns each student to a "Tutor Group."

48. During Doe's time at SIUC-SOM, there were ten to twelve Tutor Groups per unit with approximately eight students in each group.

49. They were led by an instructor, known as a Tutor Group Leader ("Tutor" for short).

50. The students do not stay with the same group for the entire academic year. Rather, these Tutor Groups, and the Tutor Group leaders, change from unit to unit.

51. During Doe's time at SIUC-SOM, Tutors varied widely in experience and training. Some Tutors had PhD's in areas that may or may not have been relevant to the subject of study for the unit, others were merely instructors, with a Masters Degree in some field of science. The Dean of Students (Dean Herrold), for example, was a Tutor whose highest degree is a Masters in Physics.

52. Each Tutor Group meets with its Tutor three times a week for the entire morning.

53. In Tutor Groups, students are given information about a simulated patient with a medical problem (related to the aspects of basic sciences currently being taught). All of the Tutor Groups get the same simulated patient problem at the same time.

54. These simulated patient problems typically require one to two weeks of class discussion, depending upon the number of "learning issues" presented in the case. "Learning issues" are questions students should "naturally" ask in the course of discussing the patient's case. For example, "hemoglobin binding" and "blood coagulation cascade" are learning issues that should arise "naturally" from a sickle cell anemia case.

55. During a simulated case, students first consider potential diagnoses that might fit the case, and then suggest differential diagnoses to determine the most likely diagnosis based upon the symptoms presented.

56. The Tutor does not test the students in the Tutor group, or give them any quantitative grade on the material discussed. Exams (discussed below) take place outside of Tutor Group.

57. However, at the end of the unit, the Tutor evaluates each student's performance. These evaluations supposedly contribute to the profile of the student's overall performance for the unit.

58. According to SIU-SOM policy, Tutors are not supposed to intervene in discussions of a diagnosis or learning issue. The students are supposed to discuss and discover the learning issues and related problems among themselves. If learning issues are not uncovered by the end of the case, they are explained to the students by the curriculum administrator upon the close of the case.

59. In practice, most Tutors ignored this principle of PBL methodology. They pointed their students directly to learning issues, and did not wait for students to discover them on their own.

60. In particular, the experienced Tutors had prior knowledge of what was going to be on the exams, and most of them did steer their students in the direction of answering those questions.

61. As a result, the degree of preparation of the students going into mid-unit and final exams in basic science could vary sharply from one Tutor Group to another, depending upon: (a) the Tutor's academic area of expertise; (b) the Tutor's prior experience with the Course; and (c) the degree to which the Tutor was willing to ignore the PBL rules and coach for the exam.

62. Tutors are supervised by an Administrative Curriculum Director and (generally) a representative of the relevant Department (e.g. neurophysiology, biochemistry, cardiophysiology).

63. "Curriculum Director" is an administrative position.  During Doe's time at SIUC-SOM, there were two Curriculum Directors: Professor Eric Niederhoffer and Professor Sandra Shea.

64. Professor Niederhoffer was Course Supervisor for the first (CRR) unit, during both years Doe attended SIUC-SOM.  There was no separate academic supervisor in that unit.  Professor Shea (Curriculum Director) and Professor Clough (academic advisor) jointly supervised the second (SSB) unit. The Course Supervisor for the third (ERG) unit was either Professor Hales, Chair of the Physiology Department, or Professor Gupta from Biochemistry.

66. Course Supervisors are responsible for preparing the simulated patient scenarios to be used in Tutor Groups.  They also monitor on-line discussions by the students in all of the Tutor Groups, and respond to on-line student questions.  But they had little direct interaction with students.

67. During each unit, students are given a mid-unit exam and an end-of-unit ("final") exam in the basic sciences.  They are also given a mid-unit and final exam in clinical skills.

68. All students from all of the Tutor Groups take the same mid-unit and final exams.

69. SIUC-SOM offers fewer lectures than typically offered at other medical schools.  PBL pedagogical theory assumes that medical students will naturally uncover many of the learning concepts through their discussions in their Tutor Groups, without needing to resort to lectures.

70. Only a few lectures are mandatory.  These generally relate to administrative functions and summary "case wraps" at the end of each simulated PBL case.  A number of more substantive lectures are offered, but these are presented as "voluntary" or optional for students to attend.

71. Furthermore, in each unit, the substantive lectures are generally given by more than one professor.  The lectures (and lecturers) are coordinated by the Course Supervisor.

72. As a result of this complex pedagogical structure, there is no one professor whom the students can readily identify as being in charge of testing and assigning the basic science grades for each unit; hence, no one professor to go see, if she believes an exam was graded incorrectly.

73. Anatomy forms a central organizing principle for the study of the basic sciences in each of the three units of the academic year.  It is especially significant in the SSB unit.

74. Anatomy has both a lab component (examining human cadavers to locate and identify anatomical structures), and a theory component (learning the function and significance of these structures).  The anatomical structures considered in *unit one* would be the ones associated with CRR; in *unit two*, the ones associated with SSB; and in *unit three*, the ones associated with ERG.

75. There is an anatomy lab Supervisor for each unit, separate from the Course Supervisors for that unit.  This further compounds the complex hierarchy of authority.

76. Typically, eight students are assigned to (and must share access to) one cadaver for lab.  In the second and third units of the academic year, the students assigned to one particular Tutor Group are also assigned the same cadaver to examine.   But in the first unit of the academic year, a student's cadaver assignment is not correlated to his or her Tutor Group assignment.

77. To Doe's understanding, it is SIU-SOM policy for students to be assigned a different cadaver each unit.

79. This rotation of cadavers matters because: not all of the cadavers are in good condition. They may have physical anomalies, related or unrelated to the cause(s) of death.  In addition, even when in good condition, it is important for students to study both male and female cadavers.

80. However,  Doe was assigned the same cadaver for all three units in the academic year 2012-2013.  This cadaver was riddled with tumors that obscured the basic anatomical structures.

81. Exams in the basic sciences (both the mid-unit exam and final exam) are divided into two parts, which are really two separate exams: one exam corresponding to the academic/theory component of study and the other to the laboratory/anatomical component.

82. The former exam consists of a series of multiple-choice questions.  The students fill out their answers on a bubble sheet that is (presumably) objectively graded.

83. For the latter exam, pins would be placed in the cadaver.  The students would then have to identify the precise anatomical structure to which each pin is pointing, and answer follow-up questions discussing the functional and clinical significance of the anatomical structure identified.

84. The lab exam is subjectively graded.  The student's name is placed unencoded on the exam, making it easy for a grader who is biased to target a given student for fraudulent grading.

85. The identifications on the lab exam are inherently tricky because: (a) every cadaver is different; (b) if a pin is moved even the slightest, it may be pointing to a different anatomical part; (c) there may be another structure obscuring the view of the base of the pin; (d) the flag at the top of the pin itself may obscure the structure at the base; and (e) the student has to decide how general (e.g. pointing to the cerebellum), specific (e.g. a structure within the cerebellum), the examiner wants the identification to be, based upon the precise location of the pin and/or inferences drawn from the follow-up questions.

86. Natalie Viscomi served as a Teaching Assistant ("TA") and subsequently an Instructor in the anatomy lab for each of the six units Doe attended SIUC-SOM.  At the time, Ms. Viscomi had a Masters degree, and was working towards her PhD in neurophysiology and neuroanatomy.

87. In addition to Ms. Viscomi, there were from one to three other Masters Students who worked as TA's in the lab, depending on the unit.  But Ms. Viscomi was the most experienced TA and maintained a kind of lead or supervisory role in the lab, with respect to the other TA's.

89. Professor Patrylo was an Associate Professor of Neurophysiology at SIUC.

90. Professor Patrylo had been a professor at the Yale medical school, before he came to SIUC.

91. Ms. Viscomi was one of Professor Patrylo's graduate students in neurophysiology.

92. Neurophysiology is the most important component of the SSB unit.  During Doe's time at SIUC-SOM, Professor Patrylo was responsible (when healthy) for presenting the substantive lectures on neurophysiology.

93. For the first (CRR) unit in both the 2011-2012 and the 2012-2013 academic years, the anatomy lab was supervised by Dr. Li.

94. For the second and third unit of Doe's first year, the anatomy lab was supervised by Professor Clough, with Ms. Viscomi also exercising a supervisory role in her position as head TA.

95. Upon information and belief, during Doe's second year at SIUC-SOM, the school transitioned into giving Ms. Viscomi full control over the anatomy lab.  Specifically, during the second (SSB) unit, Dr. Clough remained officially in charge, but he was out of town much of the time, due to a family emergency.  He left Ms. Viscomi mostly in charge during the second unit.

96. Upon information and belief, Ms. Viscomi was then elevated to the status of Instructor, rather than TA, and placed in full charge over the lab for the third (ERG) unit.

97. Ms. Viscomi was given this increased authority despite explicit complaints by Doe to Dean Herrold concerning Ms. Viscomi's blatant acts of hostility/discrimination against her (Doe).

98. Ms. Viscomi was also responsible for grading anatomy exams, throughout Doe's time at SIUC-SOM.  That gave Ms. Viscomi substantial influence over the Doe's final grades.

99. Ms. Viscomi in turn was beholden to Professor Patrylo as her academic mentor.

100. According to Ms. Viscomi's procedure for grading, at least as applied to Doe, if a student made an incorrect identification on the first part of an anatomy lab question, then that student's subsequent explanation of the functional and clinical significance of the wrongly identified structure would not be graded at all.  The student would end up with a 0 for both parts.

101. But with at least some other students, Ms. Viscomi would make an exception, giving the student half credit for the wrong identification, and using this as a justification for grading the follow up answer according to its merit(s), even though based upon an incorrect identification.

102. To Doe's knowledge and belief, SIUC-SOM has no official policy about whether wrong identifications should get half or no credit, or whether persons with wrong identifications should get partial credit for their follow-up answers, if consistent with the (wrong) identification.

103. Upon information and belief, the "no credit" policy (as applied to Doe) was based upon Ms. Viscomi's discretion.  Because she knew the policy was harsh, she modified it to help other students, but did not do so for Doe.

104. Ms. Viscomi also helped certain students correct their answers, during the exam.  She would walk by their desks, and they would point to identifications they were unsure of.   Then she would indicate to them with a nod of her head whether the identification was correct.

105. In addition, Ms. Viscomi would allow ten minutes at the end of the exam for students to go back and check their identifications.  During this time she often conferred with some of her favorite students in a whisper about their exams, apparently guiding them to the right answer(s).

106. Doe never benefited from one of these tips from Ms. Viscomi.  Nor did she ever receive half credit on any of her identifications, so her explanation could be graded on its merits.

107. To the contrary, on one SSB exam, Doe asked Ms. Viscomi whether she wanted her (Doe) to identify the *region* where the pin was pointing, or the particular *structure* to which it pointed.  At that time, Doe had already written down the structure – the hypothalmus – which was the correct answer.  But Ms. Viscomi looked at Doe's answer, saw that it was correct, and then explicitly misled Doe by saying that: No, she wanted a region rather than a structure.  Ms. Viscomi then watched Doe erase her correct answer, changing it to the wrong answer.  As a result, Doe received a 0 not only for this answer but for the follow up discussion question as well.  If it had not been for Ms. Viscomi's intervention, Doe would have gotten full credit for both parts.

108.  On another occasion, after an exam was graded, Ms. Viscomi informed the class that only one person got a certain identification right, and so that particular identification, as well as the follow up questions to that identification, were thrown out and not graded.  Doe was the one student who got the question right, but she was not given any credit for it.  Ms. Viscomi was the one who graded Doe's exam, and because Doe signed her name on the exam (since the school does not use an anonymous code), Viscomi clearly knew that Doe was the student who got the question right, when the decision was made not to count that question at all.

109.  The exams are all graded on a strict curve.  If Doe had been the only one to get credit for that question and the follow-up, she would likely have risen significantly on the class curve.

110.  On yet another occasion (discussed more fully below), Doe could not see where a pin was pointing on the cadaver, so she asked Ms. Viscomi for help to see it better.  (Students are not allowed to

touch or move the pin.). Instead of helping Doe, Ms. Viscomi ridiculed her in front of the class for not being able to see where the pin was pointing.

112. Ms. Viscomi also routinely gave some students extra coaching or help sessions outside of class. She presumably considered this to be a normal and proper function for a TA.

113. However, (as will be discussed more fully below) Ms. Viscomi forbade Doe from attending any help sessions outside of class, given by any of the TA's. To Doe's knowledge and belief, she was the only student barred from obtaining such help from the TA's.

114. SIU-SOM has an elaborate and secretive system of grading, which makes it virtually impossible for a student who believes she has been unfairly graded, or discriminated against, to review her exams and determine whether the individual questions were graded reasonably, or whether the cumulative score was computed correctly.

115. First of all, under SIUC-SOM's grading system, students are not even allowed to see their final exams after they are graded.

116. To Doe's understanding, the reason they are not allowed to review their final exams, after grading, is because the exam questions are largely recycled every other year. Students are typically given the same exam questions in basic sciences as the class from two years previously.

117. By contrast, students are allowed to see their *mid-unit* exams after they are graded. However, they are told these mid-unit exams are given much less weight than the final exam.

118. Secondly, the only information that the students do receive regarding their performance on the final exam is a (conclusory) set of grades in the individual subject areas for that unit. For example, subject areas in SSB include (but are not limited to) neurophyiology, neuroanatomy, gross anatomy, histology, . . . . In each subject area, the students receive a separate number score (with a class-wide mean and standard deviation for that subject), followed by a letter grade for that subject – S (satisfactory), C (concern), or U (unsatisfactory).

119. The numerical grades for some subject areas (e.g. gross anatomy) are derived only from the subjective anatomy/lab exam. For other subject areas, the numerical grades are derived only from the multiple choice exam. Still other subject areas are evaluated in part from questions on the anatomy/lab exam and in part from questions on the multiple choice exam.

120.  The point-value (or weight) of each individual question is not marked on the test and not otherwise known to the students.  Nor are students told which test questions affect which subject areas. Therefore, students have no way of determining how their performance on individual test questions are aggregated into a raw "score" for the given subject area, or even which teacher or teacher(s) is responsible for doing the aggregation.

121.  The grading is further complicated in that there might be six subject areas in a unit. But students are not told how much weight is given to each subject.  For example, in SSB, students receive grades in such subjects as neurophyiology and histology.  But it is widely known that the former carries very high weight and the latter very low weight.

122.  This does not end the complications either, because the mid-unit exam grades then have to be weighed in with the final exam grades, but students are not told definitively how much the mid-unit exam will count relative to the final, or who is responsible for combining them.

123.  Finally, the aggregated numerical scores and/or letter grades that the students receive for each subject area have to be combined somehow into a single final letter grade for the Basic Sciences for that unit.  Again, this single final grade would be either an S, C, or U.

124. Likewise, students receive a single grade – S, C, or U – in Clinical Skills each unit.

125.  Thus, for the three units (or trimesters) of the academic year, the students would receive a total of six final (letter) grades.

126. The policy and practice at SIUC-SOM is that: if one (but only one) of those six final letter grades is a U during the course of the academic year, then that unit would have to be remediated during a three-week course in the summer.  But if there were two or more U's, then the student would have to repeat the entire first year of medical school.

128.  Overall, there is no individual teacher a student can ask about how her final grade was computed, because she cannot know which teacher is responsible, and thus accountable for each act of grading and each act of aggregation.  Nor are students told if aggregation is done by formula (which the student could theoretically verify), or based upon pure teacher discretion.

129.  Consequently, the entire grading process is a black box, which operates on the input data (being the student's answers to the individual test questions) in a manner that is completely mysterious to the students.

130.  *A propos* of the relative weighting of subject areas, about the only information Doe ever received was a statement by Ms. Viscomi to the class that: To her knowledge, no one who has failed the anatomy/lab portion of the SSB exam has ever passed Basic Sciences for that unit.

131. This meant Ms. Viscomi had substantial control over whether a given student would pass the SSB unit, subject to any direction she might be receiving from her professor/supervisor.

132. In short, under SIUC-SOM's system of grading, if a teacher wishes to act with bias in grading one particular student, for whatever reason, the student would find it nearly impossible to detect specific acts of dishonest grading, much less prove it to higher authorities at SIU-SOM.

133. This entire grading process shows a reckless indifference to the due process and equal protection rights of students, who wish to know how they are being graded.

134. Ordinarily in an academic setting, and despite a teacher's vast discretion, there are checks and balances on the teacher's grading practices.  Each question on an exam would have a point value (which is usually written on the test).  Students can review their exams, check each question to see what they did wrong or if the question was graded correctly, and if necessary, even compare to other students' answers and how they were graded.  The scores on each question can then be added up in a transparent fashion, so that the student can determine if the final numerical grade is correct.  If some step in the process is done improperly, the student can go directly to the teacher responsible to obtain an explanation and/or correction.

135.  But none of these transparencies were/are provided to SIUC-SOM students.

136.  Without any of these basic landmarks of transparent grading, a student has little if any rational basis for determining whether she was graded accurately, fairly, or even honestly.

137.  Even if she should come up with evidence that a couple of questions were graded inaccurately, or even unfairly (and as in Doe's case, that another question was dropped from the exam altogether after she was the only one who got it right), the student would have no way of estimating

how much the alleged "errors" impacted her final test grade, much less how or whether it impacted her final overall grade in the Basic Sciences for that unit.

138. SIUC-SOM does provide a process for reviewing grades.

139.  Several weeks after the end of each unit, after all tests are graded, SIUC-SOM convenes a committee known as the Student Performance Committee ("SPC") to review each student's grades for the unit.  A grade is not "final" until this review is completed.

140.  But, as a practical matter, this process has little value.  In the first place, to Doe's knowledge and belief, the SPC functions merely to review the grade, not to (re-)calculate the grade from scratch.  The data reviewed would include the numerical scores that the student was given in each subject area of the exam, but not the raw data from the individual test questions.

141.  In the second place, the lack of transparency in the grading process makes it virtually impossible for a student to successfully appeal her grade.  She would invariably be found to have insufficient data to prove conclusively, as would be her burden, that she was graded improperly.

142.  In the third place, the student herself, who would be the most eloquent advocate on her own behalf, is not even allowed/invited to attend this meeting.

143. That renders the review process meaningless, at least in a case like Doe's, where the student alleges that her grades were deliberately sabotaged and that the numerical scores in the subject areas do not actually reflect her performance on the tests.

144.  Generally speaking, a student who believes she might have been discriminated against on a final exam, would not even be allowed to see the exam where the error might have occurred.  And even if she could prove there was an error, she would be unable to establish how egregious the error was, how many points it might have cost her, in which subject areas, or how much those subject areas weighed towards her final grade.  Nor could she readily establish which teacher was responsible (*i.e.* intentionally discriminating against her).

145.  Without the ability to frame a credible appeal, a student's grade would be entirely subject to the whim of the teacher assigning the grade.

146.  This makes it possible for a corrupt professor or surrogate TA to act with virtual impunity in grading a student unfairly, whether due to race, sex, age, or retaliatory malice.

147.  Moreover, a teacher who wishes to discriminate in grading a student would find it easy to do so because students sign their own names to their exams, so grading is not anonymous. A teacher with discriminatory intent can readily single out the paper of the targeted student.

148. It is standard practice in other professional schools to use an anonymous grading system, in which each student signs her paper with a code rather than her name.  Under that system, a teacher would find it difficult to target one student.

149. Again, this shows reckless indifference on the part of SIUC-SOM to the possibility that a student might be discriminated against by her teacher.

150. Nevertheless, despite the difficulties of proof, Doe alleges in this lawsuit and believes that she was graded unfairly and with bias. She bases her allegation on: (a) the repeated behaviors of Ms. Viscomi demonstrating bias against her; (b) the close and dependent relation between Ms. Viscomi and Professor Patrylo; (c) the disparity between her strong performance in Clinical Skills covering the same scientific material in which she "flunked" Basic Sciences; and (d) her strong record of performance on independent testing, proving she had mastered the core subject matter.

151.  During both of her years of attendance at SIUC-SOM, Doe's unsatisfactory grades occurred in Basic Sciences.  She did get a U in Clinical for the third unit of the first year.  But this was because she already had received a U in Basic Sciences in both of the first two units, so she knew she would have to repeat the entire year anyway (see ¶ 126 above). It was her understanding that she was not even supposed to take the final exams in Clinical Skills or Basic Sciences at the end of the third unit. Except for that unit, her grades in Clinical Skills were satisfactory.

152.  Clinical Sections are taught by clinicians (MD's, Nurse Practitioners, or Physicians' Assistants).

154.  In Clinical, students are required to evaluate  "patients".  The "patients" are actors paid to mimic the symptoms and responses of a patient with the condition being diagnosed.

156.  Students are evaluated on how effectively they: (1) ask questions in formulating a patient history; (2) order tests relevant to the patient's likely condition; (3) devise differential diagnoses; (4) create problem lists (which identify problems, next steps, and follow-ups specific to that patient); and (5) ultimately arrive at an actual diagnosis.

157.  To be effective in these skills, a medical student must have a solid knowledge of the basic sciences related to the maladies and diagnoses in question.

158.  Just as in Basic Sciences, the students in Clinical take a mid-unit and final exam.

159.  In addition, students receive performance evaluations from their Clinical Mentors, and from the "patients" whom they evaluated.

160.  Doe's performance evaluations from her Clinical Mentors were generally very high.

161.  Moreover, Doe exceeded her classmates in patient evaluations nearly every time.  Indeed, she received a 5 from patients on more than one occasion, despite the fact that the patients were told not to rate first year students higher than 4 out of 5 (due to the students' inexperience).

## VI. Sexual Harassment, Hostile Enviornment, and Retaliation in Academic Year 2011-2012

### A. First (CRR) Unit – First Year

170.  Professor Anderson was the Course Supervisor for Clinical Education for all three units in Doe's first year at SIUC-SOM.

171. Professor Niederhoffer was the Supervisor for the first (CRR) unit of that year.

172. To Doe's knowledge and belief, Professor Niederhoffer was regularly assigned to supervise the CRR unit in the Basic Sciences. He had done so for at least the previous two years.

173.  Professor Niederhoffer has a PhD in biochemistry, but he is not a medical doctor.  His stated area of focus is science education.

174.  As Course Supervisor, Professor Niederhoffer was the person primarily responsible for assigning incoming students to their Tutor Groups.

175.  Doe was assigned to the Tutor Group led by Dr. Li.

176.  Dr. Li is a medical doctor.  During the time Doe was a student at SIUC-SOM, Dr. Li was the only medical doctor (MD) to serve as a Tutor Group leader.

177.  Dr. Li's area of expertise is neuroscience.  This would have made him best qualified as a Tutor for the second (SSB) unit.

178.  However, to Doe's knowledge and belief, Dr. Li only Tutors in the first (CRR) unit.

179.  According to general reputation among both students and faculty at SIUC-SOM, Dr. Li was considered to be the worst (*i.e.* least effective) of all the Tutors.

180.  Indeed, the Dean of students for SIUC-SOM, Dean Herrold, specifically told Doe during her first unit that Dr. Li was their weakest Tutor.

181.  To Doe's information and belief, Dr. Li's students have a significantly higher rate of failure in Basic Sciences for the CRR unit than the students working with any of the other Tutors.

182.  Professor Niederhoffer had full knowledge when he assigned Doe to Dr. Li's Tutor Group that Dr. Li was considered a weak teacher, and his students had the highest failure rate.

183.  Doe was the only older woman and mother in her matriculating class.

184.  According to information and belief, in each of the two previous years, Professor Niederhoffer also assigned the only older woman and mother in the matriculating class to Dr. Li's Tutor Group.  It is statistically unlikely that such a pattern would happen merely by accident.

185.  Doe believes that Professor Niederhoffer, and perhaps other administrators at SIUC-SOM, may have targeted her (and other similarly situated women) for failure because she was an older student and single mother.  She believes that some professors/administrators at SIUC-SOM did not think such older women should take up valuable places in SIU's medical school.

186.  Unlike other Tutor Group Leaders, Dr. Li adheres strictly to the rules of PBL pedagogy. He is careful not to coach or guide the students to the correct learning issues during discussions, or in preparation for their Basic Sciences exams.

187.  Upon information and belief, the multiple choice part of the Basic Sciences exam (or at least a substantial part of it) is recycled every two years.  The experienced Tutors therefore know many of the questions that will be on the exam, and can prepare the students accordingly.

188.  Upon information and belief, other Tutors not only coach to the exam, but some of them even reveal specific exam questions to their Tutor Groups in advance of the exam.

189.  By assigning Doe to Dr. Li's Tutor Group, Professor Niederhoffer knowingly made it more difficult for her to succeed in her first unit at SIUC-SOM.

190.  In addition, Doe had direct conflicts with Professor Niederhoffer on at least three occasions during that first unit.

**1. Opposing a Perceived Act of Sex Discrimination by Professor Niederhoffer**

191.  Professor Strader was one of the SIUC-SOM lecturers during the first unit.

192.  Upon information and belief, she was an (assistant) professor at the time.

193.  Doe thought she was an excellent lecturer.

194.  However, she heard various comments criticizing Professor Strader.

195.  At the same time, Doe noticed that Professor Niederhoffer began attending Professor Strader's lectures, apparently for the purpose of (negatively) reviewing her performance as a lecturer.

196.  Doe came to believe that Professor Niederhoffer wanted Professor Strader to be fired. Indeed, she (Strader) told Doe that she believed he (Niederhoffer) was trying to get her fired.

199.  Furthermore, Doe believed that the criticisms articulated against Professor Strader during the first unit were superficial.  Similar complaints were not leveled against male lecturers who acted similarly..  The hostility seemed to be directed against Strader in part because she is a *female* professor.

200. Doe therefore decided to go to the SIUC-SOM administration and speak out in favor of Professor Strader.

201.  Upon information and belief, Doe's statement of support for Professor Strader made Professor Niederhoffer angry.  In fact, during the SSB unit, Professor Patrylo told her explicitly that: (a) Professor Niederhoffer had been trying to get Professor Strader fired; and (b) Doe's support for Professor Strader had angered Professor Niederhoffer.  Professor Patrylo also warned Doe and her Mother (see below) that he suspected Doe's grades were tampered with.

**2. Correcting Professor Niederhoffer's Mistake**

202. The class maintained an electronic bulletin board, on which the Curriculum Director (Professor Niederhoffer in the first unit) posted the simulated patient diagnostic scenarios and engaged the students (from all of the Tutor Groups) in questions and discussion.

203.  On one of the patient scenarios, Doe noticed an error, affecting the likely diagnosis.  She posted a question to Professor Niederhoffer on the electronic bulletin board, pointing out the problem and asking for a clarification/correction.  This was standard procedure for the class.

204.  Professor Niederhoffer's response was supercilious and insulting. He insisted that the meaning was apparent from context.  He posted what he said was the "correct" interpretation.

205.  However, Professor Niederhofer's "correct" interpretation was in fact incorrect.

206.  Doe explained the problem to one of her fellow students – a male – who then posted Doe's question again to Professor Niederhoffer with her explanation.

207.  This time, Professor Niederhoffer admitted his mistake, corrected it, and thanked the young man publicly for spotting the issue.

208.  Professor Niederhoffer never acknowledged Doe, or apologized to her for not taking her question seriously in the first place.

### 3. Confiscation of Doe's exam before it was finished

209.  Professor Niederhoffer was proctor for the mid-unit exam in the Basic Sciences.

210.  The bubble sheet for the exam was organized in such a way (e.g. with question 25 coming just below question 5) that Doe thought it might lead her to fill in the bubbles out of order.   Therefore, she decided to wait to fill out the bubble sheet until the end of the exam.

211.  When time was called, Doe had only filled out perhaps half of her bubble sheet.  She got up and walked towards Professor Niederhoffer's desk, filling in the bubble sheet as she went.

212.  When Professor Niederhoffer saw her filling our her bubble sheet as she walked to the front of the room, he flew into a rage.  He yelled at her, and confiscated her exam.

213.  At least one-third of her answers were not yet filled in, and she flunked the test.

214.  At the time that Professor Niederhoffer confiscated Doe's paper, there were a number of other students still sitting at their desks working (or filling out their own bubble sheets).  Professor Niederhoffer said nothing to any of these students, and did not confiscate their papers.

215. He singled out only Doe to confiscate her paper.

216.  But even more disturbing was the unprofessional and unreasonable degree of Professor Niederhoffer's anger, over what was at most a small offense.

217.  Doe was so taken aback that she went immediately to Dean Herrold.

218.  Professor Niederhoffer literally watched as Doe went into Dean Herrold's office.

219.  He knew or should have known that his behavior had been unreasonable, and he must have known that Doe had gone to the Dean's office to make a complaint against him.

220. On the basis of these three incidents, Doe infers and believes that Professor Niederhoffer maintained a grudge against her, which may have affected her Basic Science grade during the first unit.

221. Upon information and belief, Professor Niederhoffer was in charge of administering the end-of unit exams for CRR, and played a prominent role in determining students' final grades.

222. Exam grades and teacher evaluations were reported for the first unit in December.

223. Doe received very good written evaluations from both her Tutor Group Leader, Dr. Li, for her knowledge of the Basic Sciences; and from her clinical mentor, Dr. Panchmukhi, for her knowledge of Clinical Skills.

224. According to the grading report she received, she did not do well on the end of unit exam. But, as already noted, she was not allowed to see her exam, and so she had no way of verifying whether she was graded accurately or fairly.

226. The SPC convened a few weeks after Doe received her grades, and informed Doe that she had received a U in basic sciences and an S in Clinical Skills for the first unit.

227. These two grades are logically inconsistent. It would be hard to score an S in Clinical Skills, based upon diagnosing patients for CRR related illnesses, if one does not understand the basic science of CRR pathologies.

228. After receiving her final grades for the first unit, Doe met with Dean Herrold to talk about them. Dean Herrold repeatedly tried to get Doe to "admit" that she was not sufficiently motivated, or alternatively too busy as a mother, to handle medical school.

229. Doe adamantly denied it. She was highly motivated. Being a doctor had always been her dream. She had given up a lucrative career on Wall Street to pursue that dream, and spent much of her savings (while foregoing the opportunity to add to those savings), in order to pay tuition both for pre-medical preparatory classes and medical school.

230. In an attempt to "prove" Doe's alleged lack of commitment, Dean Herrold accused Doe of being late for class repeatedly. Doe flatly denied this. Once, early in the unit, she was late for Tutor Group due to health reasons. She called Dr. Li in advance to tell him she would be late.

231. Moreover, Doe had already informed Dean Herrold about this health problem, even before it caused her to be late that day.

232.  Doe's only other instance of lateness involved a lecture which was *voluntary.*  As Dean Herrold well knew, Doe was not required to attend that lecture at all.

233.  Subsequently, near the end of the second unit, Dean Herrold and Professor Niederhoffer censured Dr. Li for failing to report that Doe was chronically late during the first unit.  The fact was verifiably false, and Dr. Li denied it as well (to no avail).

234.  Doe met again with Dean Herrold in January to discuss her performance.  This time both of Doe's parents were present,  Dean Herrold again suggested that Doe consider another career rather than medicine because of her (alleged) lack of commitment.

235.  To Doe's knowledge, Dean Herrold has never suggested that other students quit medical school after getting one U in the first unit.

### B. Second Unit (SSB) – First Year

236.  The second (SSB) unit began in December and extended through the end of March.

237.  Doe was assigned to a Tutor Group which was led by Defendant Professor Patrylo for the first half of the unit, and then by Professor Rose for the second half.

238.  Professor Patrylo's area of expertise is neuro-sciences, the key subject for SSB.  Upon information and belief, he was the lead researcher in neuro-sciences at SIUC at the time.

239.  In addition to being a Tutor, Professor Patrylo was a principal lecturer for this unit.

240.  Professor Rose's expertise is also in neuro-sciences.  He was an untenured assistant professor at the time.  His tenure review was completed later during the academic year 2011-12.

241.  Professor Patrylo was Professor Rose's mentor at SIUC.  Upon information and belief, they had been collaborating at the time in their research and laboratory work.

242.  As already noted, Ms. Viscomi was the head TA in the anatomy lab, placing her in a supervisory position over the other TA's.  She had a Masters Degree at the time, and was working on her PhD in neuro-sciences.

243.  Upon information and belief, Professor Patrylo served as mentor to Ms. Viscomi, on both her Masters thesis and her Doctoral thesis.

244.  Professor Patrylo had played no academic role (neither as Tutor nor Lecturer) during the first unit. Doe had had no contact with him, prior to the first day of class for the second unit.

245.  The first day of class was a Monday.  The next day, Tuesday afternoon, Professor Patrylo called Doe, and spoke to her for about 20 minutes.

246.  Doe was on her way to perform her clinical hours with Dr. Panchmukhi at the time.  She remembers being impatient as the phone conversation dragged on, but feeling she could not afford to be rude to her professor and Tutor Group leader.

247.  Professor Patrylo spoke effusively about how impressive Doe's record was – high school valedictorian, graduate of an elite East Coast college, investment banker on Wall Street.

248.  Doe did not told him her exam scores for CRR, but he already knew.  He said that, given her strong academic backgound, he could not believe how low her exam scores were.

249.  Professor Patrylo spent most of this first phone call asking Doe various personal questions about herself, having nothing to do with class, and offering his own personal stories in response.  He told her he had lived much of his life on the East Coast, and especially New York City.  He seemed to know Doe was divorced.  He told her that he, too, was getting a divorce.

250.  Professor Patrylo also told Doe how much he liked her pearl earrings, which she had not worn to class, but she can be seen wearing in her class picture.

251.  Doe found it odd that Professor Patrylo knew so much about her personal background and academic performance.  She found it even more odd that he noticed and admired her earrings from that class picture.

252.  Although Doe did not know it at the time, her test scores from CRR should have been confidential, according to SIUC-SOM policy.  Professor Patrylo should not have been able to access those scores, or know how she had performed in the first unit, without her permission.

253.  After commenting on her exam scores, Professor Patrylo assured Doe that she did not have to worry, because: now that she had him as her Tutor, she would do fine in SSB.

254.  At the time, and even though the phone call seemed very odd, Doe assumed the best.  She felt that she had been treated unfairly by Dean Herrold and Professor Niederhoffer during the first (CRR) unit.  And so, she felt reassured to know that her new professor believed in her.

255.  Doe's suspicions about how Dean Herrold and Professor Niederhoffer treated her were further aroused early in the second unit when she learned from a secretary in the Dean's office that the

Administration was asking pointed questions about her, which questions the secretary thought were improper.

256.  Subsequently, Professor Patrylo also began reporting to Doe that members of the Administration and faculty were speaking about her in a negative light.  For example:

A. One time, he told her that the Administrators do not like her, and that Professor Niederhoffer, in particular, was out to get her.  He said that he had "seen this happen before," and proceeded to tell her about former students who had been mistreated by SIUC-SOM.

B. Another time, he told her that the other Tutors were speaking badly about her, at meetings of the Tutor Group Leaders.

C. Yet another time, shortly before the mid-unit exam, Professor Patrylo told Doe's mother that he suspected something was wrong with how Doe was being graded, and that she (the mother) ought to "subpoena her grades."

257.  Nevertheless, Professor Patrylo repeatedly assured Doe she would do fine in SSB, because he would take care of her.  He told her that no student of his had ever flunked the unit.

258.  With hindsight, Doe infers that Professor Patrylo targeted her for an intimate relationship from the start.  Toward that end, he: (1) sought to isolate her from other members of the Administration and faculty; (2) offered himself as her protector and friend (who would see to it that she passed); and (3) tried to bond with her by stressing how different they were from the other students and teachers at SIUC-SOM (on account of their shared interests in music and the arts and their shared East Coast sophistication).

259.  On just the second day of class, Professor Patrylo confided to Doe that he was recovering from sepsis.

260.  At the end of the first week of class, on a Saturday, Professor Patrylo called Doe again. This time he spoke to her for about 45 minutes.

261.  As became the pattern, he did almost all of the talking, and practically none of the conversation had anything to do with class.

262.  During this conversation, he talked at length about his divorce.  He told Doe about his wife's neurological issues resulting from an accident she suffered years ago.  He said he had taken care of her back then, but now she was being a "bitch" to him.

263.  Professor Patrylo told her he was planning an important business trip to China, and how he wanted to bring his daughter, but his wife was trying to prevent that.

264.  He further told Doe about all of the Chinese dignitaries he was scheduled to meet.

265.  Then he returned to the theme of growing up in New York, talking at length about how he used to hang out in the punk rock scene in the city.

266.  After this lengthy and very personal phone call, Doe felt uneasy.  While she did feel compassion for Professor Patrylo about his divorce, she also knew that this type of discussion, from her teacher, was highly inappropriate.  But she believed she had nowhere to turn for help.

267.  In the first place, she did not trust Dean Herrold.  Complaining to her about Professor Niederhoffer during the previous unit had only served to get her (Doe) into more trouble. She was determined to keep a low profile this time. In the second place, she feared that rebuffing Professor Patrylo, and complaining about him to the Administration, might cause him to retaliate against her. Doe knew she could not afford such retaliation.  She already had a U from her first unit.

268.  With hindsight, Doe believes that Professor Patrylo targeted her precisely because of her vulnerability.

269.  And indeed, Doe did feel highly vulnerable.  Consequently, she decided to put up with his excessive "friendliness" at that time.

270.  She did take precautions, however, deciding from the start never to meet with Professor Patrylo alone, not even on campus.

271.  In the second week of classes, Professor Patrylo began texting Doe, generally everyday, and often several times per day. He also called her, perhaps three or four times per week.  For the most part, the texts and calls were personal, having nothing to do with school.

272.  The texts were generally lengthy and demanded answers.  If she did not answer promptly enough, he would call her.

273.  Even during the winter break (which came early in the second unit), he texted her nearly every day, including Christmas day.

274. His texts did not just seek personal advice. They were designed to make a favorable impression. He presented himself as a Renaissance man, suggesting intimacy through their supposedly shared sophistication.

275. Professor Patrylo also played upon Doe's fears – telling her that the Administrators did not like her, and offering himself to be her champion.

276. Doe did feel isolated at this time. She felt there was no one else with clout at SIUC-SOM, upon whom she could rely, except Professor Patrylo.

277. After Christmas break, Professor Patrylo's calls and text messages increased. Her phone was constantly ringing or alerting her to his messages, which were generally quite lengthy.

278. This interfered with her work. Studying for medical school is demanding enough, while raising a child. But the requirement of reading Professor Patrylo's lengthy text messages and offering responses was draining for Doe, both in terms of time and energy.

279. Nor could she just turn off her phone. Being a parent, her phone had to be available at all times.

280. When she ignored his text messages, he would call her to demand a response. She felt trapped, compelled to read his lengthy messages, and answer back (either by text or phone).

281. As the unit progressed, Professor Patrylo's behavior became more erratic. He began calling her in the evening and repeating stories he had already told her. He looked jaundiced. He even wrote Doe that his liver enzymes were high, and told her he was having memory problems.

282. Doe concluded that he was probably having a severe drinking episode.

283. During this unit, Professor Patrylo also tried to recruit Doe to help him sell art work belonging to his mother. His mother had a number of valuable pieces of art she needed to sell. Somehow, he decided that Doe would be an expert, perhaps because of her business experience.

285. As a Tutor, Professor Patrylo ignored PBL pedagogy. He routinely coached his students, telling them what the key "learning issues" were in each of the patient scenarios they covered, instead of allowing the students to discover those issues on their own.

286. Shortly before the mid-unit exams, Doe arranged with the other students in her Tutor Group to host a study session at her apartment.

287.  Professor Patrylo found out about the study session and invited himself to attend.

288.  Doe did not want Professor Patrylo to attend this event at her home.  She was afraid that he would stay after the other students left, and that she might find herself alone with him.  As a precaution, she asked her mother to come (from Collinsville) to chaperone.

289.  Professor Patrylo called Doe a number of times prior to the event.  This was not to talk about teaching, but about the social nature of this gathering – what food and drinks to bring, etc.  He seemed to be genuinely excited and nervous about coming to her apartment.

290.  Professor Patrylo clearly had prior knowledge about what questions would be on the exam.  During the study session, he coached the students generally for the exam.  He even presented two questions verbatim as they would appear on the exam, and gave the answers  292.  After the other students went home, Professor Patrylo did in fact linger to talk with Doe and her mother.  Professor Patrylo told Doe's mother what he had previously told Doe – that certain members of the faculty and/or administration were out to get her.

293.  He explicitly advised Doe's mother to subpoena Doe's grades.

294.  Shortly before the mid-unit exam, Professor Patrylo called Doe several times to see if she wanted to get together with him. She declined, telling him she was studying.  He repeatedly offered to help her study.  He suggested they meet somewhere.  She declined each suggestion.

295.  Still, these phone calls preyed on Doe's mind.  They interfered with her ability to focus on, and complete her studying for the mid-unit exams.  She feared Professor Patrylo was offering her a Faustian bargain – grades in return for sex.

297.  Right after the mid-unit exams, Professor Patrylo was hospitalized for about a month.  He then came back to SIUC for several weeks, but was hospitalized again for about a month during the third unit.  No official reason was given, but Doe already knew that Professor Patrylo had sepsis, that he was struggling with his divorce, that he was jaundiced, and that his liver enzymes were elevated.  She surmised that he had a combination of a mental disorder and alcoholism.

298.  While Professor Patrylo was in the hospital, the texts and calls stopped.  He explained to Doe afterward that he did not have his cell phone during his stay in the hospital.  Doe inferred that he may have been in a psychiatric ward, which would not allow cell phones.

299.  Professor Rose took over as Tutor Group Leader for Doe's Tutor Group after the midterm exam.  This was Professor Rose's first time being a Tutor at SIUC-SOM.

300. In addition, Professor Rose, along with other faculty members, filled in for Professor Patrylo, and completed his lectures in neuroscience for the rest of the unit.

301.  When Professor Patrylo returned from his first stay in the hospital, he immediately began texting and calling Doe, just as before.

302.  Professor Patrylo first asked Doe out at this time, albeit tentatively and with rationalizations.  For example, he suggested they go to a University lecture series together, telling her it would look good for her to attend, and improve her relations with the SIUC-SOM faculty.

303.  Professor Patrylo's renewed attentions made Doe even more nervous.  She found it difficult to concentrate on her studies.  But, she still did not feel safe reporting it to Dean Herrold – not after her experience in the first unit, when she believed both Professor Niederhofer and the Dean retaliated against her.

304.  For his part, Professor Patrylo continued to pose as Doe's friend and benefactor.

305.  Doe's final exam scores in the Basic Sciences at the end of the SSB unit, as reported to her by SIUC-SOM, were low.  Professor Patrylo, who was by then back from the Hospital, offered to intercede with the SPC on her behalf, when they met to determine her final grade.

306.  As already noted, a student cannot appear before the SPC to argue her own case.

307.  Given Patrylo's status (as professor), his expertise in neuroscience (the subject of the SSB unit), and his familiarity with her work (as her Tutor), she decided to rely upon him. She figured that his opinion in her favor would carry more weight than any other student advocate.

308.  Her reliance turned out to be misplaced.  Despite Professor Patrylo's repeated promises to represent her, Doe learned afterwards that he never showed up to the SPC meeting.

309.  The result of the SPC hearing, in which Doe was not represented, is that she received final grades of U in Basic Sciences and S in Clinical Skills.

310.  By contrast, the written evaluations of her teachers were favorable.  Professor Rose's evaluation stated that her knowledge of the subject was satisfactory.  He gave no indication that she was struggling to learn the material.  And her written evaluation from Clinical was strong.

311.  In addition, it is hard to explain how Doe's work in Clinical Skill and diagnostic could be good, if her underlying knowledge of the Basic Sciences correlating to the diagnoses was so poor.

312.  Of course, this second U meant that Doe would have to come back the next year (academic year 2012-13) and repeat the entire first year of medical school.

313.  However, Professor Patrylo seemed pleased when he learned that Doe had failed SSB. He told her: "At least I'll have you back with me next year."

### C.  Third Unit (ERG) – First Year

315.  In light of her grades in the first and second unit, Doe already knew she would have to repeat her entire first year of Medical School.  (See ¶ 126).  Her grade in the third (ERG) unit no longer mattered.  Doe did attend classes, but she was not in fact graded (in Basic Sciences).

317.  Professor Patrylo's second hospitalization occurred early in the third (ERG) unit, not long after the SPC meeting for the SSB unit.

318. He returned in late spring, and again began texting and phoning Doe obsessively.

319.  One of Doe's friends, who observed some of these phone calls and text messages from Professor Patrylo, suggested she speak to Professor Rose about it, and she did so.

320.  Doe met with Professor Rose and tried to call his attention to the unwanted text messages Professor Patrylo was sending her.  However, Professor Rose chose to focus on Patrylo's mental health. He asked Doe: "What is going on with Professor Patrylo?  I know he confides in you."  She described his erratic behavior, and unstable mental condition.  She pointed out that this was making her very uncomfortable, and she again asked to show Professor Rose some of his text messages.

321.  However, Professor Rose declined to see the text messages.

322.  Professor Rose told Doe that Professor Patrylo had been having trouble for some time getting his own work done, and that he (Rose) often had to cover for him.

323.  Professor Rose further told Doe that Professor Patrylo was drinking shots of vodka before coming to work, and that he looked jaundiced.

324.  Professor Rose then asked Doe for her opinion/diagnosis.  Doe said she thought Professor Patrylo had a bipolar disorder.  He was most likely drinking as a form of self-medication.

325.  Professor Rose then said he believed this might be a matter of life or death for him.

326.  Doe tried to explain that: if Professor Patrylo was a threat to himself (as Professor Rose apparently thought), then he was a threat to her as well.  But Professor Rose did not respond (at that time) to Doe's concerns about her own safety.

327.  SIU's sexual harassment policy is published to all of the staff, annually.

328.  The policy requires that any professor, who becomes aware of possible acts of sexual harassment, including by a professor towards a student, must report that harassment to the proper authority.  Proper authorities would include the chair of the neuroscience department, Professor Clough (who was Professor Patrylo's immediate supervisor); the Dean of Students, Dean Herrold; the Human Resources ("HR") Department; and/or a designated Title IX officer.

329.  However, Professor Rose did not, at this time, report Doe's complaint to any of the proper authorities at SIU.  Nor did Professor Rose suggest to Doe that she could or should report her concerns about Professor Patrylo to the appropriate authorities at SIU.

**VII. Academic Year 2012-2013**

**A. First Unit (CRR) – Second Year**

330.  In August, shortly before the new school year, Patrylo sent Doe a gift with a note.

331.  At about this time, the contacts from Professor Patrylo – texts, e-mails, and phone calls – accelerated further.   They overwhelmed Doe, significantly interfering with her daily life.

332.  Often, she did not bother to answer.  But then, he would re-send the texts as e-mails.  And if she still did not answer the e-mails, he would call her.  He called her often.

333.  Professor Patrylo also began asking her out on dates.  These included coffee and dinner. Doe declined each time.  In addition, he proposed the idea of going out to a rock concert together.  But she did not express any interest.

334.  He told her explicitly that dating would "no longer be a conflict for them", because he was "not going to be a Tutor Group Leader". (*i.e.* in the SSB unit).  However, he neglected to mention that he would still be giving the primary lectures in neuroscience.

335.  She stopped answering when he asked her out.  But he still kept asking.  It was alarming to her that he would not take "no" for an answer, and he would not be discouraged.

336.   Early on, during this first unit of the new school year, Doe became aware that Professor Patrylo was keeping track of her schedule.  In his communications, he often indicated that he knew where she was (or where she was going) and what she was doing at the time – such as when she was driving to and from Collinsville, when she had her classes, when she was likely to be at the library or lab, and even where she parked her car.

337.   Doe came to believe that he was stalking her.  She decided the problem was quite serious, and that she needed to be concerned for her physical safety.

338.   She arranged for friends to walk her to and from her car, and she avoided being alone at night in the lab or library.

339.   But, based upon past experience, she still did not feel comfortable bringing a complaint against a professor to Dean Herrold.  She believed that the Dean would automatically take the professor's side, and the complaint would only precipitate retaliation against her.

341.   Furthermore, by this time, she had become aware that Dean Herrold had a financial relationship with Professor Patrylo.  Dean Herrold's live-in boyfriend owns/owned an antique shop in Carbondale.  Dean Herrold helped arrange for Professor Patrylo to sell some of his mother's valuable pieces of art through her boyfriend.  Upon information and belief, Dean Herrold and her boyfriend were sharing finances at the time.  Therefore, Dean Herrold stood to benefit directly from these art transactions, which were substantial in size.

342. Rather than go to Dean Herrold to complain about Professor Patrylo, Doe decided to take the matter up again with Professor Rose, who at least understood that something was wrong.

343. Professor Rose seemed to take Doe's personal safety concerns more seriously this time. He scheduled a meeting between Doe and the neuroscience Department Chair, Professor Clough, to discuss her allegations that Professor Patrylo was sexually harassing and stalking her.

344. But Professor Clough canceled at the last minute, for reasons never explained.

345. Subsequently, Professor Rose rescheduled the meeting between Doe and Professor Clough two more times.  These attempts extended into the second SSB unit.  But each time, Professor Clough cancelled the meeting without explanation.

346.  As a result, Professor Clough never met with Doe to discuss her complaint(s).

347.  During that first (CRR) unit, Doe also attempted to discuss the matter with her Tutor Group leader, Professor Zaczek, a professor in the physiology department.

348.  Doe met with Professor Zascek shortly before the mid-unit exam.  They spoke at length regarding Professor Patrylo. Doe read aloud several of the messages that he had been sending her.  She also told Professor Zascek that Professor Patrylo appeared to be stalking her.

349.  Professor Zascek expressed serious concern about the matter, and said she was going to report it to her Department Chair, Professor Hales.

350.  Subsequently, Professor Zascek told Doe that she had indeed reported the problem to Professor Hales, and indicated that Professor Hales would contact her, but he never did.

351.  To Doe's knowledge, neither Professor Hales nor Professor Clough took any actions whatsoever in response to her allegations of sexual harassment and stalking by Professor Patrylo.

352.  In the mean time, Doe could not concentrate upon her studies.  Her fear of Professor Patrylo continued to grow, but she did not seem to have any recourse.

353.  She began reading literature about the psychology of stalkers.  Among other things, the literature warned that any response at all can encourage (or inflame) the stalker.

354.  Based on this literature, Doe decided to stop answering Professor Patrylo's messages altogether, but to do so without confronting him or telling him explicitly to stop.

355.  For about a week, she maintained silence.  One morning at 7:45 A.M. Doe parked her car in the student parking lot and walked towards Lindegren Hall for her 8 AM Tutor Group class.

356.  As she approached the building, she saw Professor Patrylo standing on the walkway, waiting.  He was not walking anywhere.  He was not talking to anyone.  He was not reading anything.  She was shocked to see him just standing there.  The only classes in Lindegren Hall that morning were the Tutor Group sessions.  And Professor Patrylo was not a Tutor for that unit.

357.  She concluded that he was waiting there to confront her.

358.  She was frightened.  But she had to walk past him to get to class.

359.  As she approached, he accosted her with anger in his voice:  "Why haven't you been returning any of my text messages?"  When she did not give a satisfactory response, he said: "At least let me know you're all right once in a while," and hurried across the street towards his office.

360.  That same night, he sent Doe a text message, reinterpreting their morning encounter in a dramatically more benign and less confrontational light.  He wrote that she must have been very busy, and that must be why she had not been responding to him.  He went on to tell her how beautifully she moved when she walked, how pretty her dress was, etc.

361. Doe received this message as she was leaving town (for the weekend) on a personal matter

362.  Professor Patrylo continued to send her a flurry of texts while she was away at the wedding, and on into the next week (when she returned).  She still did not answer any of them.

363.  That next week, she noticed that Professor Patrylo could often be seen hanging around both inside and outside of Lindegren Hall at the change of classes.  To Doe's recollection, he had never done so before.  He would just stare at her, but not say anything.

364.  She also began receiving strange phone calls.  The caller did not speak, but would simply listen when she answered. She could hear his breath in the phone.

365.  Doe noticed the phone number of the caller belonged to a University phone.  Upon inquiry, she was able to trace it back to Professor Patrylo's laboratory.

366.  At that point, Doe realized that her silence was not dissuading him.

367.  On Thursday of that week she e-mailed Professor Patrylo to tell him explicitly that she did not want to have any more contact with him.

368.  Immediately after that, Doe sent an e-mail to Dean Herrold asking for a meeting.  By this time, Doe was far more concerned about her personal safety than any possible retaliation by the Dean.

369.  The next day (Friday), Professor Patrylo was in the building at every change of classes, watching her.  Again, he did not speak to her.

370.  Dean Herrold met with Doe later in the day.  Doe described Professor Patrylo's behavior and showed the Dean some of his text messages.  Doe said she was seriously concerned for her safety.

371.  Dean Herrold responded by attempting to dismiss Doe's concern, telling her: "I don't think he would ever be dangerous."  She said he cared too much about his job.

372.  Doe did not find Dean Herrold's answer to be convincing or reassuring.  Although Doe ageed it would not have been in Professor Patrylo's rational self-interest to harass or stalk her, it was clear to her that Professor Patrylo was not acting rationally at all.

373.  Upon information and belief, Dean Herrold was well aware of Professor Patrylo's alcoholism, and his mental and physical health problems.

374.  Doe insisted to Dean Herrold that she (Doe) had good reason to be concerned for her safety, and that the school should take action to protect her.

375.  Dean Herrold told Doe she did not think Professor Patrylo had a key to Lindegren Hall (where the students studied and had classes).  She promised to make sure he did not.

376.  But as Dean Herrold well knew, and as had been the subject of prior administrative memos, the door to Lindegren Hall was often left open, even at night.  Making sure Professor Patrylo did not have a key (if she in fact did so) would not have provided Doe much protection.

378.  Dean Herrold took no further action on behalf of Doe.  She did not investigate her complaint, hold a hearing, make findings of fact, or take such disciplinary action against Professor Patrylo as might be warranted, be it anything from issuing a formal reprimand to suspending Professor Patrylo for the academic year.  Nor did she take any significant remedial action to keep Professor Patrylo from having direct contact with Doe for the rest of the academic year, and/or to make sure he did not otherwise retaliate against her, such as through her grades.

379.  Later that same Friday afternoon, as Doe was leaving class, a friend of hers was telling her how odd it was that he kept seeing Professor Patrylo hanging around the classroom building all day.  Just as he was saying this, he looked up, saw Professor Patrylo watching them, and exclaimed: "Oh my god!  There he is again."

380.  At this point, Doe was very frightened.  It seemed clear to her that he was stalking her. Yet, Dean Herrold had not offered to do anything to protect her.  Professors Rose and Zascek had referred her to Professors Clough and Hales respectively, but they did nothing.  She felt that no one at the Carbondale campus of SIU-SOM would do anything to protect her.

381.  The next day (Saturday) she called Dean Constance in Springfield, the overall dean for SIU-SOM.  Doe told Dean Constance that Patrylo had been harassing her and stalking her.  She told him that she felt frightened all the time and could not study or concentrate on her classes.

382.   Doe offered to send Dean Constance proof in the form of text messages and e-mails from Professor Patrylo, but the Dean declined to look at them.  Instead, he promised to refer the matter to the HR Department at SIUS.  He told Doe that someone from HR would contact her.

383.   The following Tuesday, Penny McCarthy from HR (in Springfield) called Doe to discuss her allegations.  They talked at length, and Doe sent some of Professor Patrylo's text messages and e-mails to Ms. McCarthy for her to read.

384.   Doe made quite clear to Ms. McCarthy that she was afraid to go to classes, and she could not concentrate upon her studies.

385.   Ms. McCarthy promised to investigate.  But she did not offer Doe any kind of security or protection in the mean time.

386.   Ms. McCarthy did not inform Doe at the time about any procedure requiring Doe to file a formal complaint (if there is such a requirement), before HR would investigate.  Nor did Ms. McCarthy explain to Doe and obtain her consent to inform Professor Patrylo of the complaint, if informing Professor Patrylo was considered necessary to effect an investigation.

387.   Nevertheless, upon information and belief, and for reasons never explained to Doe, no further investigation took place.  Nor were there any hearings, findings of fact, or remedial or disciplinary actions proposed or undertaken by SIU.

388.   Upon information and belief, the only action which took place as a result of Doe's complaint to HR was that Ms. McCarthy, or someone from SIU acting with her knowledge, did in fact contact Professor Patrylo to inform him about the charges – without telling Doe they did so.

389.   In the absence of any attempt at investigatory or remedial actions, SIU officials had no logical reason to inform Professor Patrylo of the complaint.  Informing him merely put Doe at greater risk, giving Professor Patrylo further motive to retaliate and perhaps physically harm her.

390.   To make this matter worse, Doe did not even find out that Professor Patrylo had been notified about her complaint until the following July, when SIU-SOM convened a meeting to determine whether or not Doe should be allowed to advance to SIUS-SOM for the next year.

391.   After Ms. McCarthy's first phone call to Doe, it took her about two weeks to finally call Doe back. Doe was literally on her way to an exam at the time, and so she told Ms. McCarthy that she

could not talk or respond.  But Ms. McCarthy insisted.  She asked Doe just to tell her, yes or no, if there had been any new incidents since the last time they talked.  Doe said there had not.

392.  That was the last time Doe heard from Ms. McCarthy, or anyone else from HR.  No findings of fact regarding the complaint were prepared.  No remedial or disciplinary action was recommended.  Professor Patrylo did not even get so much as a formal reprimand.

393.  SIU-SOM has a written policy which addresses sexual harassment.  This policy was published on a website maintained by the Springfield campus of SIU.  However, incoming medical students were not told about this website.

394.  The language of the policy, as published on the website, does not appear to contemplate sexual harassment of a student by a professor.  In relevant part its focus is student-on-student harassment. (The policy also discusses workplace harrassment for staff). For example, the first step of the Complaint Resolution Procedure states: "Persons who have been subjected to sexual harassment are encouraged to inform the individual . . . that his/her behavior is unwelcome and should cease.  Complaints are most effectively addressed at the earliest possible stage."  But it is not reasonable to expect a student to confront her professor about sexual harassment at the earliest possible intimation that he is stepping outside the bounds of a student-teacher relationship.  After all, he is the one in control of her academic success or failure.

395.  The policy does require any professor who learns of a sexual harassment complaint made by a student to investigate, or else refer the matter to an official who can investigate. The policy further prescribes steps for University officials to take upon receiving such a complaint.

396.  However, in Doe's case, none of the several faculty and administration officials whom Doe contacted regarding Professor Patrylo's unwanted attentions took any of the steps prescribed by the policy to address her complaints.

397.  As a result, SIU did nothing to protect Doe or make it safe for her to go to school.

398.  To add insult to injury, Doe was already taking evasive actions on her own. In particular, she changed out cars with her parents, and began parking in designated visitors' parking lots around campus.  But campus police soon recognized she was not a visitor, and began ticketing her.

399.  Doe informed Ms. McCarthy about these tickets and asked for relief.  But inexplicably, HR only got about half of her tickets rescinded, leaving Doe to pay the rest.

400.  Doe received a C in Basic Sciences for the first (ERR) unit in the academic year 2012-13. She received an S in Clinical Skills for that unit.

### B.  Second Year – Second (SSB) Unit

401.  Professor Patrylo's area of expertise is neurophysiology, the core subject for the SSB unit. He was assigned to present a number of the substantive lectures during this second unit.

402.  Although attendance at his lectures was officially "voluntary",  it would have been difficult for any student to learn the necessary material for the second unit without attending.

403.  However, Doe was so disturbed and frightened by Professor Patrylo that she could not bring herself to attend his lectures. Doe told Dean Herrold she could not attend.  But the Dean did nothing to accommodate her.  Nor did anyone else from SIU offer any accommodation.

404.  Accommodation would certainly have been possible.  There were other professors in neurophysiology, notably Professor Clough and Professor Rose, who could have given the substantive lectures, in place of Professor Patrylo.  Or at a minimum, SIUC-SOM could have made videotapes of Professor Patrylo's lectures, which Doe could have studied outside of class.  But this was not done.

405.  Doe was forced to study neurophysiology on her own, from sources online, not geared specifically to the curriculum at SIUC-SOM.

406.  Upon information and belief, Professor Patrylo helped to design the questions on the neurophysiology part of the basic sciences exam for SSB.  In any event, he knew what would be on the exam and designed his lectures to address the issues that would be tested.

407.  The fact that Doe did not have the benefit of Professor Patrylo's lectures put her at a distinct competitive disadvantage on the neurophysiology part of the Basic Sciences exam.

408.  In fact, Doe's score in the subject area of neurophysiology (for the SSB unit) was the lowest of any student in the entire 2012-2013 class.

409.  In accord with SIUC-SOM policy or practice (as discussed above), Doe was not permitted to review the exam afterward to determine if it was accurately, or even honestly graded.

410.  However, her test score in neurophysiology did not correlate with her overall knowledge of the subject, as measured by the standardized National Board of Medical Examiners ("NBME") test (discussed in more detail below).

411.  Upon information and belief, Professor Patrylo had a pattern of targeting female medical students over the years.

412.  The pattern showed itself again in the 2012-13 academic year.  During the SSB unit that year, Professor Patrylo "befriended" a first year medical student, Emily Jones.

413.  Ms. Jones had already gotten a U in the prior CRR unit.  This made her "vulnerable".

414.  Professor Patrylo had been neither a Tutor, nor a lecturer during the CRR unit.  Nor did he serve as a Tutor for the SSB unit that year.  He should not have had any reason to know Ms. Jones, much less to have access to the information that she got a failing grade in the first unit.

415.  Nevertheless, upon information and belief, Professor Patrylo found out that Ms. Jones received a U in the first unit, and sought her out with the promise to "help" her pass SSB.

416.  Toward that end, Professor Patrylo offered Ms. Jones tutoring (outside of class).

417.  Dean Herrold knew or should have known that Professor Patrylo was providing this special assistance to Ms. Jones.  Despite the Dean's knowledge of the nature of Doe's complaints, she made no inquiries about Professor Patrylo's actions toward Ms. Jones.

418.  Upon information and belief, Professor Patrylo further arranged for Ms. Viscomi to give Ms. Jones private tutoring sessions in the lab.

419.  Not only did Ms. Viscomi provide special help to Ms. Jones, she also provided extra lab tutoring, outside of class, for another group of about seven students.

420.  However, Ms. Viscomi explicitly barred Doe from obtaining similar help.  (See details below.).  To Doe's knowledge, she was the only student barred from obtaining such help.

421.  It is difficult for anyone to examine a cadaver without assistance.  First of all, the cadaver has to be moved, which Doe could not do by herself.  One can, of course, obtain help by working with another student, or by obtaining assistance from a TA.

422. Secondly, the identification of the anatomical parts of a cadaver is an art. No two cadavers are the same, and no textbook can capture that reality. The assistance of an experienced teacher in making identifications would have been invaluable for Doe.

423. Thirdly, Doe's cadaver was riddled with tumors, obscuring its (normal) anatomical features. It was by far the most distorted of the ten (or so) cadavers in use. Working with an experienced TA, who would be using a different cadaver, would have been invaluable for Doe.

424. SIUC-SOM uses the same cadavers for the entire academic year. It is SIU-SOM policy, however, to rotate cadavers, so that no student is assigned the same cadaver for more than one unit. This rotation is easy to arrange, given that there are ten cadavers, and only three units.

425. Nevertheless, Doe was assigned the same tumor-riddled cadaver for all three units. Doe alleges and believes that Ms. Viscomi and/or Professor Clough were responsible for assigning her this cadaver in the second and third units.

426. Early in the second unit, Doe complained to Clough and Viscomi about being assigned the same badly flawed cadaver as in the first unit. Neither of them did anything about it.

427. Furthermore, even after she called the problem to their attention in SSB, they assigned her the same cadaver again in ERG. This shows that they did so deliberately.

428. Doe was the only student assigned to the tumor-riddled cadaver for all three units. In fact, she was the only one assigned to this particular cadaver for more than one unit.

429. Doe alleges and believes that this was done in order to sabotage her work, or at least make it more difficult for her to learn anatomy.

430. As already noted, Doe did attempt to bring her complaint against Professor Patrylo to Professor Clough (three times) through Professor Rose, but Professor Clough refused to respond.

431. Doe believes Professor Clough wanted to silence Doe, or punish her for complaining.

432. Upon information and belief, Ms. Viscomi was informed of Doe's complaints against Professor Patrylo, prior to the start of the second unit. She too sought to silence Doe, and retaliate against her on behalf of Professors Patrylo and Clough.

433. Early in SSB, Doe did ask fellow student, Ms. Jones, to work on examining the cadaver with her. Ms. Jones told her she had no need, since she was working with Ms. Viscomi.

434. Doe has no objection to this *per se*.  She understands it to be part of a lab TA's job to help students examine their cadavers and identify the anatomical parts thereof.

435. Indeed, during that SSB unit, two of Doe's fellow students arranged for another TA, Catherine Meadow, to give them extra assistance outside of class.  They invited Doe to join them.

436. However, when Ms. Viscomi found out Doe was going to be part of that group, she went directly to Doe and told her that she was not allowed to get help from Ms. Meadow.

437. Upon information and belief, Ms. Viscomi did not tell the other two students in Doe's group they could not get help from Ms. Meadow outside of class.

438. Nor does SIU-SOM have any policy forbidding students from receiving help from TA's outside of class.  This policy seems to have been made up by Ms. Viscomi to target Doe specifically.

439. It was about a week or two before the mid-unit exam, when Ms. Viscomi told Doe she could not get help from Ms. Meadow.  Doe asked Ms. Viscomi why not, but got no answer.

440. However, Doe was well aware that Ms. Viscomi herself was helping Ms. Jones (outside of class), and that she was working with a study group of about seven students, who would meet in the lab on Tuesdays.  (Lab classes were on Mondays, Wednesdays, and Fridays).

441. The next Tuesday, Doe intentionally walked in on Ms. Viscomi's study session.  She saw for herself that Ms. Viscomi was conducting an extra lab help session with these students.

442. Ms. Viscomi made clear that Doe was not welcome at this help session.

443. Doe went to Dean Herrold to complain that Ms. Viscomi had locked her out of these extra help/study sessions, and barred her from asking for help outside of class from other TA's.

444. Citing the instances where Ms. Viscomi herself was helping other students, Doe pointed out to Dean Herrold that Ms. Viscomi seemed to be specifically targeting her (Doe) for this mistreatment,   Doe further indicated to Dean Herrold that she thought Ms. Viscone was targeting her on behalf of Professor Patrylo who sought to retaliate against her for refusing his sexual advances.

445. Dean Herrold said that she knew Ms. Viscomi favored some students over others.  She said that the Administration had had complaints about Ms. Viscomi before.

446. Yet, Dean Herrold did nothing to intervene.  She did not, for example, order Ms. Viscomi to allow Ms. Meadow to work with Doe.  She did not even so much as ask Ms. Viscomi why she had a

different policy for Doe than for other students, with respect to obtaining help outside of class from the TA's; much less did she investigate whether Ms. Viscomi might have been motivated by Professor Patrylo's desire to retaliate against Doe.

447.  In effect, Dean Herrold admitted there was a problem – Ms. Viscomi's discrimination against Doe – but made no attempt to determine the cause and/or remediate the situation.

448.  Instead, Dean Herrold told Doe that she (Doe) should take the matter up with the Curriculum Committee at their next meeting.

449.  But, as the Dean well knew, the Curriculum Committee was not the right body to address allegations of discrimination and retaliation.  The Committee is only authorized to address narrower matters, such as whether TA's should be providing help outside of class.

450.  Besides,  as the Dean also knew, the Curriculum Committee was not scheduled to meet again until the end of the SSB unit, at which point it would be too late for Doe to get help.

451.  Despite Dean Herrold's acknowledgement that Ms. Viscomi did not treat students fairly, the SIUC-SOM Administration made her an "Instructor" for the third (ERG) unit, and gave her full control of lab sessions and grading, without supervision from Professor Clough.

452.  To be sure, this was not such a big change from the second (SSB) unit.  Although Professor Clough was officially in charge of the lab for the second unit, he was in fact absent from school for a substantial portion of that unit, due to medical problems in his family.

453.  In Professor Clough's absence, Ms. Viscomi was left as the *de facto* lab supervisor.

454.  On a number of occasions, Ms. Viscomi singled out Doe for differential and disparaging treatment during the SSB unit, and throughout the next ERG unit as well.

455.  In particular, Doe believes and alleges that Ms. Viscomi used her authority, as head TA in the second unit and as lab supervisor in the third unit, to prevent Doe from receiving help with her lab work, and that she did so in furtherance of Professor Patrylo's desire to retaliate against Doe, and Professor Clough's desire to silence her.  Doe further believes that Ms. Viscomi (jointly with Professor Clough) used her authority to make sure Doe had the bad cadaver.

456.  Upon information and belief, Ms. Viscomi worked with Professor Clough to design and prepare the anatomy exam in the SSB unit that year.

457.  Upon information and belief, Ms. Viscomi also graded the anatomy portion (i.e. the lab component) of Doe's exam during the SSB unit, and again in the ERG unit as well.

458.  Doe's grade in the subject area of "gross anatomy" in SSB was based entirely on her answers to the anatomy portion of the final exam (administered and graded by Ms. Viscomi).

459.  Upon information and belief, Ms Viscomi graded the anatomy portion of Doe's exam unfairly and dishonestly, thereby causing her to score poorly in gross anatomy.

460.  Doe believes and alleges that Ms. Viscomi did so on behalf of Professor Patrylo, with the intent to support and protect him against Doe, in light of Doe's complaints about him.

461.  Doe's performance on the final exam for the SSB unit was further undermined, in that Professor Patrylo served as a proctor during that exam.  This literally spooked Doe.  When she looked up and saw him staring down at her, she became panicky, and could not concentrate on the exam because she was afraid he might come up from behind her at any moment.

462.  In light of all these factors, and the likelihood that certain parts of the tests were not graded fairly or accurately, Doe received the lowest score in the class in neurophysiology (the subject for which Professor Patrylo was responsible).  She also received a very low test score in gross anatomy, a subject tested and graded by Ms. Viscomi. In addition, Doe did poorly in the subject area of embryology, which subject was also tested and graded by Ms. Viscomi.

463.  Upon information and belief, the two subjects of neurophysiology and gross anatomy carried the most weight in the SSB unit, and caused Doe to fail Basic Sciences for that unit.

464.  However, these test scores did not correlate with Doe's general knowledge of those subjects, as measured by the standardized National Board of Medical Examiners ("NBME") test.

465.  The NBME is a standardized comprehensive test.  Most medical schools use the NBME as the sole or primary means to test their students. The NBME is known to be a very good predictor of success in passing the national professional licensing exams ("Medical Boards").

466.  Prior to the academic year 2012-13, SIUC-SOM did not use the NBME to test students' performance.  Instead, the School opted to use its own internally-created exams.

467.  However, school officials became concerned about the efficacy of the internally generated exams, for determining which students had mastered the material necessary to obtain a medical license.

Consequently, SIUC-SOM administered the NBME to all first year medical students on an experimental basis, in May 2013, about two weeks before the end of the third unit.

468.  Questions pertaining to the entire first year of medical school were selected from the NBME question bank and compiled into a comprehensive "final exam", covering the first year.

469.  The test was duly graded, but not counted towards the students' grades for that year.

470.  The experiment was deemed a success.  At a faculty Retreat in June 2013, it was decided that the NBME test was superior to SIUC-SOM's own internally generated tests for the purpose of measuring students' achievement.  The notes from that retreat contain an explicit directive from Deborah Klamen, the head of curriculum for SIU-SOM, to the effect that SIU-SOM should start using the NBME as its official test, rather than the internally generated exams then being used.

471.  If Doe's NBME results had been used, instead of the internally generated exams, to determine her grades for the academic year 2012-13, she would have passed comfortably.

472.  Of the various subject areas on the NBME, Doe scored average or above on almost all. And where she scored below average, it was less than one standard deviation below average, which would be considered passing, using a standard bell curve.  Moreover, one of these below average subject areas, "gastro-intestinal", was the last subject covered in the third unit of the year.  Since students took the NBME two weeks before the end of that unit, they did not yet have the benefit of having fully covered this material in class.

473.  The NBME exams also provide circumstantial evidence that Doe was not graded honestly in the second and third units of the academic year 2012-13, as explained below.

474.  In the first (CRR) unit (where Doe does not allege that Professor Patrylo and/or Ms. Viscomi played a substantial role in manipulating the grading process against her), the scores Doe received on the internally generated exams, as recorded by subject area, correlate reasonably well with the scores she received on the NBME in those same subject areas.  For example, Doe performed way above the class average in respiratory physiology, both on the internally generated exam for the first unit and on the NBME exam, whereas she performed below average on both exams in cardiology for the first unit.

475.  However, in both the second and third units (where Doe alleges that Professor Patrylo and/or Ms. Viscomi did manipulate the grading process *unfairly* and/or *dishonestly* against her), Doe's performance on the NBME was practically the reverse of her performance by subject area on the internally generated SIUC-SOM exams.

476.  Most strikingly, Doe scored way above average on the NBME in the subject area of neurophysiology, the subject on which she had performed worst in the entire class on the internally generated test for the SSB unit.  Likewise, Doe performed above average on the NBME in gross anatomy, a subject she "flunked", according to SIUC-SOM's internally generated test.

477.  As already noted, neurophysiology and gross anatomy are the two most important topics in the SSB unit. Her scores in these two subject areas caused her to flunk the SSB unit.

478.  But, based on the NBME, she should not have flunked either one.  She scored well above average on these two subject areas combined, and clearly should have passed the SSB unit.

479.  It is hard to reconcile that Doe knew so little in neurophysiology and gross anatomy in March at the end of the SSB unit, but somehow she had a superior understanding of these same subjects in May, just a few months later – unless as alleged by Doe, the grading process on the Basic Sciences exam in SSB was dishonest, and rigged for her to fail.

480.  Ms. Viscomi continued to actively harass Doe in the SSB unit, even up to the very end of the final exam in anatomy.  At the end of that exam, Doe attempted to return the clipboard she used to write upon.  She asked Ms. Visconi where she should put it.  Out of the blue, and for no apparent reason, Ms. Visconi yelled and berated her in front of the other students.

481.  Doe told Dean Herrold, early in the SSB unit, that she did not think she was being graded fairly or honestly.  At that time, she suggested they put codes at the top of their test papers instead of their names, to keep the grading anonymous, and thereby protect students like herself from discrimination.  But Dean Herrold did not take any action to implement anonymous grading.

482.  After this incident at the end of the anatomy exam, however, Doe went straight to Dean Herrold to complain once more.  Doe asked the Dean: How can she (Doe) expect to be graded fairly when Ms. Viscomi is the one who will be grading her exam?  Dean Herrold had no answer, and took

no action to ensure that that test was graded fairly, or that subsequent tests in the third (ERG) unit were graded fairly.

**B.  Second Year – Third (ERG) Unit**

483. Despite the fact that Doe had already received a C in Basic Sciences in CRR, and a U in SSB, a decision was made to allow Doe to continue on to the third (ERG) unit.

484.  Meanwhile, Ms. Viscomi was promoted to Instructor for the ERG unit, and placed in charge of the anatomy lab.  Throughout this unit, she used her position as Instructor to continue to maintain a hostile environment and retaliatory atmosphere towards Doe; targeting her for disparate treatment, unfair and/or retaliatory grading, and other petty acts of harassment.

485.  Upon information and belief, Ms. Viscomi did so on behalf of her mentor, Professor Patrylo, in order to carry out his desire to retaliate against Doe for: (a) refusing his sexual advances; and then (b) complaining to higher officials about his ongoing sexual harassment.

486.  Upon information and belief, Ms. Viscomi was also acting with the tacit or explicit approval of Professor Clough and Dean Herrold, who both had chosen to support their colleague, Professor Patrylo, in stonewalling Doe's complaint.  They both therefore knew that they were responsible for failing to protect Doe and allowing the hostile environment to fester.

487.  To begin with, Ms. Viscomi and/or Professor Clough once again assigned Doe the same tumor-riddled cadaver as in the first two units.

488.  This cadaver belonged to a person whose cancer had metasticized.  The tumors were everywhere. This affected the CRR unit, because the heart and the lungs of the cadaver both had tumors which distorted the anatomy in question.  It affected the SSB unit, because the brain had tumors, which distorted the anatomy.  And, the entire peratoneum was full of tumors (e.g. renal cell carcinomas), which made it difficult to study the anatomy in question for the ERG unit.

489.  If the assignment of cadavers had been truly random, the odds of this unfavorable assignment of cadavers happening three times in a row would have been one in a thousand.

490.  But the assignments were not supposed to be random, after the first unit.  SIUC-SOM has a policy of rotating students to different cadavers each unit.  This is not only to address anomalies, such as tumors, but also to address such basic differences as the sex of the cadaver.

491.  In light of this strong policy militating *against* assigning any student the same cadaver even twice, the chances that a student would be randomly assigned the same (tumor-riddled) cadaver all three units, merely by accident or "innocent" administrative error, were at least an order of magnitude less than one in a thousand.

492.  But what made this more egregious: Dr. Clough and Ms. Viscomi already knew, because Doe had told them in the second (SSB) unit that she had been assigned the same cadaver as for CRR, and that it was riddled with tumors.  Yet, they assigned it to her again for ERG.

493.  Doe infers that the decision to assign her the same cadaver again in the third unit was both intentional and punitive; and that, most likely, that was true in the second unit as well.

494.  Given that Doe was the one student victimized by this unlikely sequence of administrative assignments, and given that she also just happened to be the one student who had accused a top-tier research professor at SIUC-SOM of sexual harassment, Doe further infers and believes that she was assigned this cadaver in retaliation for her complaints against Patrylo.  The purpose, as well as the effect, was to make it more difficult for her to pass her anatomy exams.

495.  Throughout this ERG unit, Ms. Viscomi also continued to prevent Doe from receiving help from the TA's outside of class.

496.  Granted, SIUC-SOM did set up formal study/help sessions in the lab for this unit.  The ostensible purpose was to enable students to get help outside of class from the TA's.

497.  Upon information and belief, these study/help sessions were set up upon the authority of Professor Clough, to give the appearance of responding to Doe's complaint that Ms. Viscomi had selectively barred her, and not other students, from receiving help from the TA's.

498.  Doe did find these extra study sessions to be somewhat useful, in giving her the opportunity to examine the TA's cadaver (which was in good condition), rather than her own.

499.  However, for the main purpose of giving her an opportunity to work with and ask questions of the TA's while examining the cadaver, these study sessions were a sham.

500.  In the first place, they were held immediately after the three hour labs.  This presented at least the following problems:

 a. After three hours of lab, the students and teachers would be burnt out. It was not an ideal time to spend another hour dissecting.

 b. The lab room itself was poorly ventilated, and decaying bodies give off not only the smell of the preserving liquids, but also the (masked) smell of decay.  By the time of the third unit, masking and preserving had become insufficient, and the decay had become increasingly difficult to tolerate for long periods of time.

 c. The students were *not* told in advance what body parts they would be examining at the lab that day.  (This is a consequence of PBL pedagogy. If they were told in advance that they were going to be looking at a certain heart chamber, for example, then that would be a big clue in telling them how to diagnose their patient during Tutor Group.  But the point of PBL pedagogy is for the students to discover the diagnosis on their own.)  Generally, students were not told until right before lab what they would be examining that day and how to perform the examination. Because the students did not know in advance, they (or in this case, Doe) would not yet have had the opportunity to look up that body part in the medical texts and formulate questions or issues to discover during the examination.  As a result, the study session had limited value.

501.  In the second place, the lab was a big rectangular room, roughly 36 feet wide and 90 feet from front to back, with two rows of five tables for cadavers.  The TA's cadaver would be at the front of the classroom, all the way at the west end of the room.  This was where Doe generally worked. Meanwhile, the TA's would sit all the way in the back of the room, some 90 feet away.

502.  Ms. Viscomi always attended these sessions, generally accompanied by another TA.

503.  Most often, that other TA would be Ms. Meadow.

504.  Naturally, these sessions were open to all of the students, not just Doe.  Other students might stay briefly to finish up what they were doing in class.  But generally, Doe was the only student who stayed after class at the lab/help session for more than a few minutes.

505.  Typically, when other student(s) did stay after class to finish up, one of the TA's would come forward from the back to help them.  But, when these other student(s) were done, the TA would retreat to the back of the room.

506.  The TA's made it a point to help the other students, but not to help Doe.

507. This was true even for Ms. Meadow.

508.  In Doe's experience, Ms. Meadow was always very helpful with students, including being helpful to Doe when Ms. Viscomi was not around.   But in these help sessions, in the presence of Ms. Viscomi, the other TA's (including Ms. Meadow) would just sit all the way in the back of the room, 90 feet away from Doe, sometimes talking and laughing to each other and otherwise just staring at Doe, waiting for her to finish.

509.  Given Ms. Meadow's generally helpful demeanor, Doe infers and believes that Ms. Viscomi ordered Ms. Meadow not to assist Doe during these study/help sessions.

510.  In summary, Ms. Viscomi prevented Doe from receiving help from TA's at these official help sessions, just as she did in prior units when the sessions were informal and unofficial.

511.  Furthermore, the situation in these official study/help sessions was very awkward for Doe. The room smelled from the dead bodies and the chemicals used.  The lab had poor ventilation.  Doe was tired after having spent many hours in the lab already, as part of the regular class.  And, the TA's were just staring at her from the back of the room, or else talking and laughing amongst themselves. She felt undue pressure to hurry up and finish.

512.  During the final anatomy exam in ERG, Ms. Viscomi revealed her hostility once again. Doe could not see where a pin was pointing from her view of the cadaver.  (During exam, several students had to gather around the cadaver at once.  Each student would have a different angle of view). The flag at the top of the pin, together with the numerous structures in the display of the cadaver's brachial plexus (a region near the armpit) were blocking her view of the tip of the pin.  This made it impossible for her to identify where exactly the pin was pointing.  Because students are not allowed to disturb the pins during the test, Doe asked for help from Ms. Viscomi to un-obstruct the view.  This is a type of question that other students ask, without incident.

513.  But, instead of assisting Doe, Ms. Viscomi ridiculed her in front of the class for not being able to see where the pin was pointing.

514.  Upon information and belief, Ms. Viscomi was the person in charge of grading the anatomy portion of Doe's exam for the ERG unit.

515.  Doe alleges and believes that Ms. Viscomi graded the anatomy portion of her exam unfairly and/or dishonestly.

516.  As before, Doe relies in part on indirect evidence.  First of all, if SIUC-SOM had based her grade on the NBME scores, Doe would have gotten an S for Basic Sciences. Secondly, her scores on the internally-created exam were inconsistent with her scores on the NBME.

517.  Thus, it was not her lack of knowledge of the subject(s), that caused her to fail.

518.  Doe further believes and alleges that the reason Ms. Viscomi targeted her for unfair treatment was to further Professor Patrylo's desire to retaliate against her; and also to back up Professor Clough and Dean Herrold, who had taken Professor Patrylo's side and stonewalled her complaint, refusing to take action to mitigate the hostile environment and prevent retaliation.

519.  With respect to grading, Doe had complained to Dean Herrold repeatedly that she was being graded unfairly and/or dishonesty.  Yet, the Dean took no measures to ensure the integrity of the process.  Rather, the Dean intentionally enabled Ms. Viscomi to discriminate against Doe, even after admitting that Ms. Viscomi was a problem.  The Dean failed to set up an anonymous grading system, which would have protected all students.  Nor did she make any attempt to obtain a neutral, independent grader for Doe's exams, to protect Doe personally from discrimination.  Her inaction was either deliberate, or grossly negligent.

520.  After the incident with the pins in the third unit, where Ms. Viscomi took the opportunity to shame Doe, Doe went directly to Dean Herrold and complained about it.  She asked the Dean how she can expect to be graded fairly, if Ms. Viscomi is in charge of the grading.  Dean Herrold still failed to take any action.

**July 2013 Meeting To Determine If Doe Would Advance to Springfield**

521.  In July, 2013, SIU-SOM held a committee hearing to determine whether Doe should be permitted to move on to SIUS-SOM and continue her pursuit of a medical degree.

522.  Among the persons on this committee were Dean Constance (Dean for SIU-SOM), Professor Klamen (head of curriculum for SIU-SOM), Professor Clough, and Dean Herrold.

523. Prior to this meeting, in June 2013, Dean Constance called Doe to discuss the matter.  Doe told him about the sexual harassment and retaliation she had experienced.  Dean Constance seemed to be truly surprised.  He asked Doe why she had not told him before?  She pointed out that she had. Then, his tone changed from friendly to hostile.  He told her it sounded like she is just making excuses.

524. At the hearing, the Dean acted as a kind of prosecutor, attempting to blame Doe somehow. He challenged her to take responsibility for what had happened to her, as if she were the cause.

525. Doe, in turn, argued that she should be allowed to advance to the Springfield campus (SIUS-COM) to continue her medical education because: (a) her scores on the NBME proved convincingly that she had learned the required material of the first year of medical school (at SIUC-SOM); and (b) the sexual harassment and retaliation had severely affected her test performance at SIUC-SOM. She also pointed out that moving to Springfield would allow her to escape the hostile environment she had experienced in Carbondale.

526. Dean Constance expressed surprise to learn about the striking contrast between Doe's performance on the NBME and her performance on the SIUC-SOM exams.

527. Professor Klamen, too, expressed astonishment that Doe could perform so solidly on the NBME's and so poorly on the SIUC-SOM exams. She considered these two results to be incompatible.

528. Doe discussed some of the various acts of sexual harassment and retaliation she had experienced, which created a hostile environment for almost the entire time she attended SIUC-SOM. She pointed out that the hostile environment affected her entire performance at SIUC-SOM, making it difficult for her to attend classes and study for exams. It isolated her from professors, administrative staff, and even classmates. It also consumed much time and energy that would have been better spent doing her classwork.

529. In addition, Doe noted irregularities in how she was tested and graded, which suggested that retaliatory discrimination had also infected the testing and grading process.

530. After Doe left, the committee discussed her case, and came to the conclusion that she should not be allowed to advance to Springfield. This discussion was not held in public, and the reasons were not presented to Doe.

## VIOLATIONS OF TITLE IX – GENERAL ALLEGATIONS

531. Plaintiff incorporates ¶¶ 1-530 above, as if fully stated herein.

532. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), applies to all educational institutions which receive federal monies, as well as to the administrative subunits thereof.

533.  The Defendants SIU and its administrative subunits, SIU-SOM and SIUC-SOM, all receive federal monies, which makes them subject to the strictures and requirements of Title IX.

534.  Title IX prohibits discrimination by an educational institution or any of its agents or employees against a student on the basis of that student's sex. This includes acts by a professor in using his power over a student to obtain or try to obtain intimate personal or sexual favors.

535.  Title IX further prohibits retaliation against a student for opposing acts of sexual harassment or discrimination against herself or others at the educational institution.

536.  These prohibitions encompass not only single acts of discrimination which are so severe as to be actionable standing alone, but also hostile environment discrimination, wherein a student is subject to ongoing acts of harassment and discrimination, which are collectively so severe and pervasive as to affect the student's ability to learn and perform in school, and generally enjoy the benefits of an education.

537.  The implementing regulations for Title IX require each educational institution (or subunit thereof) to maintain a comprehensive, written sexual harassment policy, including grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of student complaints.  (See 34 C.F.R. § 106.8(b).)

538. As part of that policy, the educational institution must designate a Title IX officer(s) responsible for receiving complaints of sexual harassment, investigating those complaints, making findings of fact, and taking remedial or disciplinary action if necessary.  The designated Title IX officer(s) must be made known and accessible to the students.

539.  Title IX further requires that each member of the faculty or administration be made aware of the sexual harassment policy.  Faculty and administrators are to be informed that if they become aware of an allegation of sexual harassment by a student, then they must address the matter promptly and properly themselves, or else report the matter to an appropriate authority.

540.  Consequently, it is a violation of Title IX for educational institutions to fail to respond promptly and investigate appropriately when a student presents a credible complaint of sex-based discrimination or retaliation by a professor.

545.   At the start of the first unit of Doe's first year, Dean Herrold (Dean of students) met with the new medical students and discussed student-on-student sexual harassment with them.   She told them that if they had any complaints about such harassment, they should report them to her.

546.   In effect, Dean Herrold held herself out to be the Title IX officer for SIUC-SOM.

547.   But if so, Doe alleges and believes that Dean Herrold did not have proper training in Title IX due process and enforcement.

548.   In her discussion of sexual harassment with the new students, the Dean talked at length about student-on-student sexual harassment, but made no mention of professor-on-student sexual discrimination, or how to handle the delicate power relations, if such discrimination occurs.

549.   Nor were students given a written statement of the University's sex discrimination policy, as required by Title IX.

550.   Doe alleges that the Defendants SIU, SIU-SOM, and SIUC-SOM, through their faculty and administrative staff, created and/or subjected Doe to sexual harassment, shaming, intimidation, retaliation, and a hostile educational environment in violation of Title IX, in that:

a) Doe is a member of a protected class.

b) Doe was subjected to harassment on the basis of her sex, in the form of repeated and unwanted solicitations of intimate friendship, sexual relationship, and stalking by Professor Patrylo.

c) Doe was further subjected to multiple, ongoing, and snowballing acts of retaliation by several administrators and faculty, due to her complaints about Professor Patrylo's unwarranted advances, and her subsequent complaints about various acts of retaliation against her for complaining in the first place.

d) These actions of harassment, shaming, intimidation, discrediting, and retaliation subjected Doe to a hostile environment throughout her two years at SIUC-SOM.

e) Defendants SIU, SIU-SOM, and SIUC-SOM enabled the harassment and retaliation, and exacerbated the hostile environment through their deliberate indifference, as shown in: (1) their lack of policies, procedures, and staff trained to address the problem; (2) their general failure to properly investigate and/or remediate the acts of sex-based discrimination of which Doe complained; and (3) their further acts of retaliation against Doe for complaining about the acts of discrimination.

551.  The hostile environment which Doe experienced was severe and pervasive throughout her two years at SIUC-SOM.  It isolated her from faculty and students, deprived her of a safe atmosphere, conducive to studying and learning, and ultimately caused her to flunk out of medical school.

## Count I – Sexual Harassment and Retaliation in Violation of Title IX

552. Plaintiff incorporates ¶¶ 1-551 above, as if fully stated herein.

553.  Professor Patrylo was and is a professor for SIUC-SOM.  He became Doe's Tutor Group Leader in the second unit of her first year at SIUC-SOM.

554.  He was an experienced Tutor Group Leader.

555. From the first day of class, Professor Patrylo sought to establish an intimate personal friendship and/or sexual relationship with Doe.  He did so using the authority and power vested in him by the Defendants.

556. Professor Patrylo was going through a divorce at the time, and sought Doe's attention as both a confidante and a love interest.

557. From the start, Professor Patrylo's personal interest was unwanted by Doe, but she did not know how to stop him, because he was her professor and she did not want to offend him.  She did take the precaution of never allowing herself to be alone with him.

558. Professor Patrylo sent her lengthy e-mails and/or text messages on a daily basis, and insisted that she read and respond to them.  If she did not respond, he would call her to talk.  This constituted a form of stalking behavior, from which Doe could not easily escape.

559.  As a single mother and first year medical student, these messages made unreasonable daily demands on Doe's time and energy.  Because of her concern about Professor Patrylo's intent, they also caused her ongoing emotional distress.  Together, the emotional distress and the unreasonable demands on her time and energy interfered with her ability to focus on her studies.

560. Professor Patrylo deliberately attempted to isolate Doe and prevent her from reaching out for help by telling her that key administrators, such as Dean Herrold, were out to get her.  Doe believed his statements were true, in part based upon the hostile treatment she received from Professor Niederhofer and Dean Herrold in the first unit.

561. Professor Patrylo promised to protect Doe, and to see to it that she passed the second unit.

562. Just prior to the midterm exam, Professor Patrylo repeatedly offered Doe help with the exam, in return for an unspecified tryst where they would meet alone, so he could "help" her.  Doe refused each time he suggested this.

563. Doe knew from Professor Patrylo's personal revelations that he was/is an alcoholic, and Doe believed he was having a mental breakdown at the time.

564. He was in fact hospitalized in the second unit for about a month, and again in the third.

565. Each time he came back from hospitalization, however, Professor Patrylo would start right back up with Doe.  His behavior towards her was obsessive.

566. The increasing frequency and intensity of his e-mails and text messages, in light of her lack of encouragement, constituted blatant stalking, and made her increasingly afraid of him.

567. Doe eventually decided that she could not handle the problem alone.  During the third unit of her first year, she complained to Professor Rose about Professor Patrylo.  However, Professor Rose did not offer Doe any assistance at this time in resolving the problem.

568. At the start of the second year, Professor Patrylo became even more obsessive in his e-mails and texts.  He also repeatedly asked her out on dates.

569. Each time he asked her out, Doe turned him down.  But Professor Patrylo was undeterred.

570. Doe also came to realize Professor Patrylo was tracking her schedule throughout the day.

571. Because Doe believed Professor Patrylo was mentally unstable, obsessed, and stalking her, she became increasingly afraid for her safety.

572. She spoke to Professor Zascek about it.  Professor Zascek expressed concern, and spoke to her Department Chair, Professor Hales.  But he did not respond to Doe's complaint.

573. Doe then spoke to Professor Rose again.  This time, he expressed concern and arranged a meeting with Professor Patrylo's Department Chair, Professor Clough.  But Professor Clough canceled the meeting.  Over the next month or so, Professor Rose arranged two more meetings.  But each time Professor Clough canceled.

574. In the mean time, Doe had stopped answering any of Professor Patrylo's messages.

575.  Professor Patrylo confronted her, making clear that he was very angry that she was not responding to him.

576.  Doe then explicitly told Professor Patrylo to cease all communications with her.

577. In response, Professor Patrylo sought to intimidate her (without speaking).  He would wait for her on the walkway as she approached class, or inside the classroom building (even though he was not teaching at the time). He would stare at her as she went past.

578. Doe found his behavior creepy and scary.  She believed that Professor Patrylo was trying to show her that he still had power over her, and that there was nothing she could do to stop him.

579. Doe had already begun taking evasive actions, not only to avoid having Professor Patrylo track her, but also to ensure that someone would accompany her when she walked across campus.

580. But, with the problem apparently escalating, she became deeply afraid for her personal safety, to the point of being scared to be on campus at all.

581. Whereas previously, she had been afraid to complain to Dean Herrold about Professor Patrylo (because Dean Herrold had retaliated against her when she complained about Professor Niederhofer during her first year), Doe now felt that her concern for her physical safety outweighed her fear that Dean Herrold would retaliate against her for complaining about a professor.

582. But when Doe told Dean Herrold about Professor Patrylo's sexual harassment and stalking behavior, the Dean merely told Doe that she did not think Professor Patrylo would harm her.  Dean Herrold took no further action.  She did not investigate or attempt to remediate the problem.

583. Dean Herrold also did not inform Doe that she had a financial relationship with Professor Patrylo outside of the University, which might have interfered with her best judgment in this case.

584. Doe then complained to Dean Constance about Professor Patrylo.  Although the Dean did not want to hear any details of the complaint, he did refer the matter to the HR department.

585. Ms. McCarthy from HR at the Springfield campus of SIU contacted Doe a few days later. She discussed Doe's complaint(s) with her in detail and promised to investigate.

586. However, there was no investigation, no written report issued, no findings of fact made, and no remedial or disciplinary actions taken.

587.  Much later, Doe learned that University officials had informed Professor Patrylo about her complaint against him, without telling her that they had done so.

588.  Professor Patrylo was already quite angry that Doe had rejected him. Doe infers that when he learned that she had accused him of sexual harassment, it fanned the flames of Professor Patrylo's sense of anger and betrayal.

589.  Upon information and belief, Professor Patrylo discussed Doe and her allegations disparagingly with Professor Clough, Dean Herrold, and Ms. Viscomi (among others).  Those parties chose to believe and/or protect Professor Patrylo's reputation by retaliating against Doe – shaming her, disparaging her, intimidating her, subjecting her to unequal and inferior work conditions, discrediting her work, and tampering with her grades.  Collectively, these were all acts of retaliation against Doe for complaining about Professor Patrylo.

590. Throughout her second year at SIUC-SOM, Doe complained about various acts of retaliation against her, stemming from Professor Patrylo's sexual harassment.  She complained to both Dean Herrold (repeatedly) and also to Professor Clough, but neither took any action to investigate.

591. In the meantime, Doe remained physically frightened of Professor Patrylo for the rest of her time at SIUC-SOM.  She continued to take evasive action to prevent him from tracking her.

592. During the second unit of Doe's second year, Professor Patrylo was the main lecturer in the most important subject area, being neurophysiology.  Doe could not bare to attend his lectures, due to his harassment and stalking of her.  She informed Dean Herrold that she could not attend because she was afraid of him.  Yet, the Dean still took no action, either to protect her (such as by replacing Professor Patrylo with another lecturer), or to accomodate her (such as by having his lectures videotaped, so she could study them in the safety of her own home).

593.  As a result, Doe had to learn neurophysiology as best she could from online sources.

594.  Professor Patrylo was substantially responsible for the exam questions in neurophysiology, or at a minimum, very familiar with what would be on the exam.

595.  Professor Patrylo has a track record of coaching students on how to answer the exact questions on the exam.  Doe had observed this for herself the previous year.

596.  All of the other students had the benefit of Professor Patrylo's coaching for the exam, but Doe did not.  Since the exams are graded on a strict curve, this placed Doe at a strong disadvantage for passing her final exam in the second unit.

597.  Furthermore, Professor Patrylo was a proctor for the final exam.  When Doe saw him standing at the front of the room staring down at her, she felt a rush of fear, and she could not concentrate on the exam.  This had a strong negative impact on her performance.

598. At Professor Patrylo's behest, or at least as a result of loyalty to him as mentor (in Viscomi's case) and colleague (in Clough's case), both Ms. Viscomi and Professor Clough targeted Doe for unequal and unfavorable treatment in the anaotomy lab throughout the second and third units of her second year at SIUC-SOM.  They did so with intent to protect Professor Patrylo's reputation by discrediting Doe,

599. Their acts of retaliation included: unequal work conditions (e.g. a tumor-riddled cadaver to examine and a rule barring her (but not the other students) from receiving any assistance from the TA's outside of class); shaming; disparagement; efforts (by Ms. Viscomi) to confuse and/or discredit her during final exams; and ultimately grade tampering.

600. Doe complained repeatedly to Dean Herrold about these latter acts of retaliation, pointing out that Ms. Viscomi was targeting her specifically in the lab for unequal treatment.  Dean Herrold knew and acknowledged that Ms. Viscomi was targeting Doe.  However, she did nothing about it.  In particular, she declined Doe's reasonable suggestion that the University set up coded and anonymous grading so that Doe might at least be graded fairly.

601. Not only did Dean Herrold take no action to protect Doe from grade retaliation, but she enabled Ms. Viscomi to retaliate further by allowing her to be promoted to Instructor for the third unit, despite her knowledge that Ms. Viscomi had been discriminating against Doe in the second unit.

602.  Consequently, Professor Patrylo's sexual harassment and the acts of retaliation against Doe on his behalf constituted a proximate and substantial cause, which resulted in Doe flunking both the second and third units of her second year at SIUC-SOM.

603.  On the basis of those grades from the second and third units, the Committee which met in July to review Doe's progress chose to dismiss her from the medical school.

604.  The fact remains that Doe's level of learning and competence in the subject areas required for the first year of medical school met or exceeded the average of the other students in her class who passed their first year of medical studies and who were permitted to advance to the second year.

605.  Doe's aptitude for medical study was evidenced by her very strong academic performance prior to medical school, her high scores on the medical school entrance exams, and her top-of-the-class performance on SIU-SOM's own diagnostic exam, administered (with six other schools) at the start of the first year of medical school.

606.  Doe's actual competence in medical school was evidenced by her strong performance in Clinical Skills. Clinical Skills builds upon the student's knowledge in the Basic Sciences.  To perform well in Clinical Skills, diagnosing and recommending treatment for a (simulated) patient, a student must have a good working knowledge of the underlying medical science.  .

607.  Doe's successful mastery of the material of the first year of medical school was ultimately borne out by her performance on the NBME exams, which she took in May 2013, about two weeks before the end of the third unit.

608.  The NBME's are the standard comprehensive exams, used by most medical schools in the United States for determining whether students have mastered the required subjects for the first year of medical school, thereby qualifying them to advance to the second year.

609.  Doe's performance on the NBME exam administered in May 2013 was satisfactory, and would have been more than sufficient, standing alone, for her to qualify to advance to the second year. But, unlike other medical schools, SIUC-SOM did not count the NBME exam for credit.

610.  Furthermore, the key subject areas which Doe purportedly flunked on SIUC-SOM's internally generated exams were precisely the subjects directed and/or controlled by Professor Patrylo, or his proxy, Ms. Viscomi.  These were also the very same subjects on which Doe performed best on the NBME's (over which Professor Patrylo and Ms. Viscomi had no control).

611.  For that reason, Doe believes that she was graded unfairly and dishonestly in these subject areas, in furtherance of the ongoing retaliation against her precipitated by Professor Patrylo.

612. Defendants committed a chain of Title IX violations against Doe, consisting of: (a) sexual harassment and stalking by Professor Patrylo; and (b) retaliation for: (1) refusing his intimate personal and sexual advances; and (2) complaining about his acts of sexual harassment, stalking, and retaliation. Furthermore, by failing to respond when Doe complained of specific acts in a snowballing chain of retaliation, several key Faculty members and Administrators, whose acts are attributable to Defendants, violated Title IX by knowingly enabling faculty with direct authority over Doe to close ranks with Professor Patrylo and retaliate against Doe through shaming, disparagement, and grade discrimination.

613.  The sexual harassment by Professor Patrylo and the further acts of retaliation which it triggered collectively constituted the proximate cause for the Committee's decision in July 2013 to deny Doe the opportunity to continue to the second year of medical school..  Indeed, this decision was the final act of retaliation against Doe.  The Committee included several members who were already prejudiced against Doe, including Dean Herrold, Professor Clough, and Dean Constance.  At the meeting, they discussed, and were well aware that Doe had demonstrated proficiency in the subject matter, through the NBME exam, sufficient to advance to the second year.  They were also well aware of Doe's well documented allegations of sexual harassment, which affected her ability to perform and learn at SIUC-SOM.  Nevertheless, key members of this Committee chose to disparage Doe instead, using false allegations as an excuse to blame her for what happened.  (See e.g. ¶¶ 662-3, 681-2, 687-9 below). Those false and retaliatory disparagements helped persuade the Committee to vote to dismiss Doe from the medical school.

Consequently, Doe suffered damages including:

  a. Psychological damage and emotional distress;

  b. Damage to her reputation;

  c. The loss of two years of tuition and related costs of attending school;

  d. Lost earnings while in school; and

  e. Future lost earnings.

### COUNT II – Failure to Respond and Other Due Process Violations of Title IX

614.  Plaintiff incorporates ¶¶ 1-613 above, as if fully stated herein.

615.  In the first unit of her first year, Doe had a problem with the Course Director, Professor Niederhofer.  She made him angry by her actions in support of a female professor whom Professor Niederhofer wanted to have fired.  Doe thought she was being treated differently than similarly situated male professors, and she spoke explicitly to Dean Herrold about it.

616.  Professor Niederhofer retaliated – first by shaming Doe publicly, then by exploding in anger at her during her first exam and confiscating her answer sheet before she could finish filling it in.

617.  Doe complained to Dean Herrold immediately after that first exam, but the Dean took no action to investigate or remediate the matter (such as by allowing Doe to retake the exam or complete the parts which Professor Niederhofer did not let her finish).

618.  Not only did Dean Herrold ignore the complaint at the time, but she subsequently sided with Niederhofer and retaliated against Doe for having raised the complaint.

619. Specifically, when Doe reiterated her complaint about Professor Niederhofer after she got a poor grade on her final exam in the first unit, Dean Herrold responded by making a blatantly false accusation against Doe – that she had been late for a number of classes – in effect blaming Doe.

620.  Dean Herrold made this false allegation in writing and without evidence, merely for the purpose of  making a record to discredit Doe in retaliation for her complaint against Professor Niederhofer.

621.  As her Tutor Group Leader (Dr. Li) confirmed, Doe had only been late for Tutor Group once, and on that occasion she called him before class to tell him she would be late.  She was also late once for a lecture, but it was a lecture she was not even required to attend.

622.  At a follow-up meeting with Doe, Dean Herrold expanded upon the theme, pressuring Doe to admit that she did not have the motivation to perform well in medical school, and suggesting that her many other obligations as a single mother interfered with her studies.  Doe insisted she was highly motivated.  But Dean Herrold urged her to drop out of school anyway.

623.  Other students, besides Doe, also flunked that first unit of medical school.  But Dean Herrold did not urge or pressure any of them to drop out of school.  Moreover, school policy states that the consequence of flunking the first unit is merely to take a three-week remedial class in the summer.  It is understood that students are to be given another chance.

624.  Dean Herrold and Professor Niederhofer continued to disparage Doe during the second unit, and fostered a general attitude of hostility towards Doe among faculty and staff at SIUC-SOM.

625.  This was confirmed by one of Doe's friends who worked in Dean Herrold's office; and also by Professor Patrylo who told Doe at various times during the second unit that: (a) some of the Administrators were out to get her; and (b) the Tutor Group Leaders talked disparagingly about her.

626.  Collectively, the above actions by Dean Herrold in failing to investigate and respond to Doe's complaint and instead retaliating against her for complaining, constituted a violation of Title IX, which is attributable to the Defendants.

627.  In addition, Professor Patrylo told Doe's mother that he thought Doe's grades might have been tampered with in the first unit.  He suggested Doe and her mother should subpoena her grades.

628.  With this in mind, Doe felt trapped when she realized Professor Patrylo was soliciting her for an unwanted intimate relationship.  She had nowhere to turn.  She did not feel she could report his ongoing sexual harassment to Dean Herrold or anyone else in the administration, without facing retaliation.  Nor had the school identified another Title IX officer she could bring her complaint to.

629.  It follows that Dean Herrold's failure to respond to Doe's complaint about Professor Niederhofer, followed by her retaliatory act in blaming Doe, contributed significantly to the impact of Professor Patrylo's sexual harassment.  It isolated Doe and left her much more vulnerable to his predations.

630.  In the mean time, Doe tried to handle Professor Patrylo's sexual harassment herself, by keeping him at arm's length, and making sure they were never alone together.

631.  But Doe grew fearful as she became aware that Professor Patrylo was suffering from severe alcohol abuse and an appaent mental breakdown.  The Administration clearly knew of his problems, because he was hospitalized twice during the academic year, for about a month each time.

632.   Following hospitalization, however, Professor Patrylo's harassment and stalking behavior merely escalated.  This made it more and more difficult for Doe to concentrate on her studies.

633.   In the third unit of her first year, Doe finally decided to seek the help of another faculty member she thought she could trust, Professor Rose.

634.   She told Professor Rose about Professor Patrylo's unwanted attempts at intimacy. Professor Rose responded that he was worried about Professor Patrylo because he (Patrylo) had a severe problem with drinking and depression.  However, he (Rose) did not take any action on behalf of Doe, or report her complaint to an appropriate University official who could investigate it properly.

635.   At the start of her second year at SIUC-SOM, Doe was still left trying to fend for herself against Professor Patrylo's increasingly obsessive stalking behavior.

636.   By that time, Professor Patrylo had begun openly asking Doe out on dates, telling her that they could be together now that he was not her teacher.  Doe refused each time he asked, but Professor Patrylo would not be dissuaded.

637.   Doe renewed her attempts to get help from other faculty members. She talked at length about Patrylo's harassment to her first unit Tutor Group Leader, Professor Zascek, who in turn referred the problem to her Department Chair, Professor Hales.  But Professor Hales did nothing in response.

638.   In his supervisory capacity as a Department Chair, Professor Hales should have been instructed by Defendants, and been made fully aware of his duty under Title IX to respond to a credible complaint by a student alleging sexual harassment by a professor.  His failure to respond constituted deliberate indifference, attributable to the Defendants, which violated the due process requirements of Title IX.

639.   Doe next brought the matter back to the attention of Professor Rose.  He seemed to recognize the seriousness of Doe's problem, this time, and referred the matter to Professor Patrylo's Department Chair, Professor Clough. On three different occasions, Professor Rose scheduled a meeting between Doe and Professor Clough.  But each time, Professor Clough canceled without explanation.

640.   Professor Clough never did anything to respond to, much less investigate Doe's complaints, or to refer this problem to an appropriate authority at the University.

641.   In his supervisory capacity as a Department Chair, Professor Clough should have been instructed by Defendants, and been made fully aware of his duty under Title IX to respond to a credible complaint by a student of sexual harassment by a professor.  His failure to respond constituted deliberate indifference, attributable to the Defendants, in violation of Title IX due process.

642.  In the mean time, Doe told Professor Patrylo she did not want any further communication with him. After that he began stalking her as she walked to and from school and classes during the day.

643.   Out of fear for her safety, Doe finally decided to complain to Dean Herrold.  She showed Dean Herrold some of the e-mails she had received from Professor Patrylo, and described his stalking. She told the Dean she was deeply disturbed by his behavior and feared for her safety.  But Dean Herrold's only response was to tell Doe she did not think Professor Patrylo was dangerous.

644.  Dean Herrold did not have the expertise to make that judgment.  In addition, her private financial entanglements with Professor Patrylo made her opinion on this matter particularly unreliable. On the basis of this conflict of interest, it was an abuse of discretion for her to make the decision not to investigate further, and a violation of Title IX, attributable to Defendants.

645.   Even if Dean Herrold were correct in her judgment that Professor Patrylo did not pose a physical threat to Doe, her response was grossly inadequate.  Whether or not Professor Patrylo was dangerous, his sexual harassment and electronic stalking, as Doe described it to Dean Herrold, was a serious matter by itself.  Dean Herrold's lack of response constituted deliberate indifference to the impact Professor Patrylo's sexual harassment had on Doe's ability to learn and perform in school.

646.  In her supervisory capacity as the Dean of students, and as the putative Title IX officer for SIUC-SOM, Dean Herrold should have been instructed by the Defendants, and been made fully aware of her duties under Title IX to respond to a credible complaint of sexual harassment by a student against one of the professors (whether dangerous or not).  Her deliberate indifference to Doe's complaints violated the due process requirements of Title IX, and is attributable to the Defendants.

647.  Furthermore, Doe brought her complaint to Dean Herrold (even though she did not trust her), because, as Dean of students, Dean Herrold held herself out to be the Administrator whom a student should go to if the student was experiencing sexual harassment.

648.  That suggests that Dean Herrold believed herself to be the equivalent of a Title IX officer for SIUC-SOM.  But, Defendants failed to provide Dean Herrold with adequate training for implementing Title IX.  Or, if they did, Dean Herrold was recklessly indifferent to that training.

649. Her lack of training in how to respond to a complaint of sex-based discrimination and or her reckless indifference to that training is a violation of Title IX, attributable to Defendants.

650.  Doe next contacted Dean Constance in Springfield.  When asked by Doe to review the matter himself, the Dean declined.  However, he did refer the matter to the HR department.

651.  A representative from HR (on the Springfield campus), Ms. McCarthy, called Doe and discussed the matter at length with her by phone.  She promised to investigate.

652.  However, she did nothing to investigate.  She did not make any findings of fact.  She made no attempt to remediate the problem, or hold Professor Patrylo accountable in any manner.

653.  The HR Department is Defendants' official representative, responsible for complaints of discrimination of all kinds, including sex-based discrimination.  HR's failure to respond to Doe's complaint, with a thorough investigation and a written report, including both findings-of-fact and recommendations for remediation and/or discipline for Professor Patrylo, violated Title IX and constituted deliberate indifference to Doe's complaint, which is attributable to Defendants.

654.  Together with Dean Herrold's refusal to respond to Doe's complaint, HR's failure to respond left Doe with nowhere else to go for help in fending off the ongoing acts of harassment and retaliation by Patrylo and other key members of the Administration and staff who were supporting him.

655.  Furthermore, the HR Department did not merely do nothing.  HR provoked further retaliation against Doe by telling Professor Patrylo about Doe's complaint, without telling Doe that it had done so.

656. As a result, and upon information and belief, Professor Patrylo sought to protect himself by actively discrediting and disparaging Doe in the eyes of others including but not limited to: his supervisors, Dean Herrold and Professor Clough; and his student, Ms. Viscomi.

657.  If HR had been intending to conduct a formal investigation, it undoubtedly would have been appropriate to inform Professor Patrylo about the complaint.  But, as HR did not undertake a

formal investigation, the act of informing Patrylo was an abuse of discretion and a violation of Doe's right to confidentiality. HR simply had no reason to inform Patrylo, given the tack it took in this case.

658. The decision to inform Professor Patrylo, without a formal investigation that could have led to disciplinary constraints being put upon Professor Patrylo, had the effect of inviting Professor Patrylo and those who supported him to continue to retaliate against Doe. As the campus expert on discriminatory behavior and prevention, the HR Department should have anticipated this effect. Therefore, its act of informing Professor Patrylo about Doe's complaint was an intentional violation of Title IX, also attributable to the Defendants.

659. This matter also implicates Dean Constance. As Dean and chief Administrator for the entire school of medicine, it was his responsibility to ensure that SIU-SOM properly implemented the policies of Title IX. This would include proper training of a Title IX officer who would be made known to the students, and proper training of the faculty and staff generally in how to respond to a sexual harassment complaint. Dean Constance failed to clearly designate a Title IX officer, and failed to train other key administrators and staff in how to respond to a complaint. This violated the due process requirements of Title IX, and is attributable to the Defendants.

660. Furthermore, in accordance with the requirements of Title IX, Dean Constance had a personal duty to investigate, once Doe reported directly to him that one of the medical school's professors had been sexually harassing and electronically stalking her for nearly a year, and was now physically stalking her as well. Dean Constance knew that Doe alleged not merely an isolated indiscretion by Professor Patrylo, but an ongoing hostile environment so severe and pervasive that it interfered with her right to a safe educational environment at SIUC-SOM.

661. Doe does not dispute that it was appropriate for Dean Constance to delegate his duty to investigate this matter to the HR Department. But, in the end, it remained his responsibility, as chief executive of the school, to ensure that the investigation was completed properly and in accord with the requirements of Title IX. Dean Constance failed to oversee the HR department, and make sure HR had addressed this problem adequately. This constituted a failure to respond on his part. In light of the fact

that Doe had reported directly to Dean Constance, his actions showed deliberate indifference in violation of Title IX, and is attributable to Defendants.

662.   Moreover, as chief executive for SIU-SOM, Dean Constance's conscious indifference to Doe's plight put all female medical students at risk for sexual harassment, and for retaliation if they complained. The chilling effect directly impacted Doe as well, who had nowhere to turn when the harassment and retaliation continued to occur.  Dean Constance's failure to respond violates the entire spirit of Title IX, and is attributable to the Defendants.

663.   Dean Constance took charge of the Committee that met in July of 2013 to determine if Doe should be dismissed from the medical school.  At that meeting he acted like a prosecutor, attempting to blame Doe for the sex-based discrimination she was subjected to.  He demanded that *she* take responsibility for what happened to her and used that as a basis for denying her the right to continue in medical school.

664. His intent to blame Doe for being the victim of sex-based discrimination appeared to be sparked by a discussion he had with Doe shortly before the meeting, when Doe pointed out to him that she had told him earlier about the sexual harassment and retaliation against her, but he had failed to respond.  When she in effect blamed him, his attitude towards her noticeably changed.  As a result, Dean Constance sought to cover up his prior violation of Title IX, by blaming Doe.  Such retaliation is itself a violation of Title IX, also attributable to Defendants.

665. Professor Clough, too, decided to do more than merely fail to respond to Doe's complaints about Professor Patrylo.  He decided to close ranks and defend his faculty member (Patrylo) from Doe's allegations against him, by undermining Doe's credibility and helping to create a hostile environment in an attempt to silence her.

666. Professor Clough was in a strong position to retaliate against Doe because he was the professor in charge of the anatomy lab for the second and third units.  Work in the lab, and the exams based upon that work, constituted roughly half of the value of the final grade in Basic Science.

667. Moreover, the person directly in charge of the lab on a daily basis, working under Professor Clough's supervision, was Professor Patrylo's PhD student, Ms. Viscomi. She too was told of Doe's complaints against Professor Patrylo, and she too made up her mind to retaliate against Doe.

668. These ongoing acts of retaliation by Professor Clough and Ms. Viscomi in the second and third units were enabled by Defendants' failure to respond to Doe's repeated prior efforts to seek help with respect to the sex-based discrimination against her.

669. Together, Professor Clough and Ms. Viscomi arranged for Doe to be given the same cadaver for three straight units. This cadaver was practically incomprehensible to examine because its organs were riddled with tumors. It is SIUC-SOM policy not to assign the same cadaver to any student for more than one unit. But, even after Doe complained explicitly to both Professor Clough and Ms. Viscomi, they knowingly and deliberately continued to assign her the same cadaver in the second and third unit. No other student was assigned this tumor-riddled cadaver for more than one unit. This was done with the intent of making it more difficult for Doe to gain a hands-on knowledge of the anatomy she was studying, in retaliation for her complaints about Professor Patrylo.

670. As the head TA in the second unit, and Instructor with full authority over the lab in the third unit, Ms. Viscomi took repeated actions to retaliate against Doe. This included general acts of shaming and harassment, specific actions making it more difficult for Doe to learn the course material, and direct acts of retaliation targeting Doe's grades on the exams.

671. In both units, she directed the TA's not to provide any assistance to Doe outside of class.

672. It is an essential function of TA's to provide help to students both in and outside of class. The TA's, including Ms. Viscomi, did provide help outside of class to the other students who asked. Doe alone was barred from receiving such help.

673. Doe complained repeatedly to Dean Herrold, when Ms. Viscomi targeted her for disparate treatment during the second and third units. During the second unit, Dean Herrold acknowledged to Doe that Ms. Viscomi was treating her unfairly. But Dean Herrold took no action to investigate or remediate. To the contrary, after acknowledging the problem, Dean Herrold allowed Ms. Viscomi to be promoted to Instructor and to be given full control over the anatomy lab for the third unit, knowing that

this would give Ms. Viscomi even more authority to retaliate against Doe.  This failure to respond showed deliberate indifference in violation of Title IX, and is attributable to Defendants.  It enabled and enhanced further acts of retaliation against Doe.

674. Doe complained to Dean Herrold in both the second and third units that Ms. Viscomi discriminated against her while she was taking the final exams, and likely would retaliate against her in grading the exams.  Doe suggested the use of anonymous (numerically coded) grading, so that Ms. Viscomi would not know which test paper was Doe's.  However, once again, Dean Herrold took no action.  Her failure to respond constituted deliberate indifference in violation of Title IX.

675. In fact Doe complained to Dean Herrold immediately after Ms. Viscomi not only singled her out for public humilation in the middle of the final exam for the third unit (for not being ablie to see where the pin had been placed on the cadaver), but she (Viscomi) deliberately refused to help her see it better, thereby preventing Doe from making an accurate identification and properly answering the follow-up functional questions on the exam.  Doe went immediately to Dean Herrold and reported the incident.  She asked Dean Herrold how she could expect Ms. Viscomi to grade her fairly.  But once again, Dean Herrold failed to respond or intervene, in violation of Title IX.

676. At the beginning of the third unit, Professor Clough apparently took action in response to Doe's complaint that she had been wrongly barred from getting help from the TA's during the second unit.  He  (or the Defendants generally) provided offical help sessions in the lab after each lab class during the third unit.  Doe attended these sessions regularly.

677. However, this attempt at mitigation missed the mark badly because Ms. Viscomi was placed in charge of the help sessions.  And she was the one about whom Doe had complained in the first place, for not letting the TA's help her (Doe).

678. Ms. Viscomi attended each session, usually with one other TA.  She and the other TA would sit in the back of the room.  They would come forward to assist other students when other students were present.  But, most of the time, Doe was alone in the lab, and Ms. Viscomi would not let the other TA's come forward to assist her.  Nor would Ms. Viscomi herself ever assist Doe.

679. As a result, this was a sham response to Doe's complaint, amounting to no response at all.

680. The failure of Dean Herrold and Professor Clough to respond adequately to Doe's allegation that Ms. Viscomi was targeting her, by barring the TA's from assisting her outside of class, showed deliberate indifference in violation of Title IX, and was attributable to the Defendants.

681. Professor Clough was one of the members of the Committee which met in July of 2013 to determine if Doe should be dismissed from the medical school.  At that meeting, he told Committee members that SIUC-SOM had responded to Doe's complaint by providing these extra lab sessions.  He then told a blatant lie to the Committee, saying that Doe had not attended these sessions.

682.  The fact is that Professor Clough had not attended these sessions.  He had no basis for this allegation he made to the Committee.  Doe attended almost every one of these sessions.  She was the only student who did so.  But the TA's, under Ms. Viscomi's direction, still refused to assist her.

683. Taken together, the factual allegations above show that key faculty members and administrative personnel in positions of authority – Dean Herrold, Professor Niederhofer, Professor Hales, Professor Clough, Dean Constance, and Ms. McCarthy – had actual knowledge of Doe's complaints about ongoing sexual harassment and retaliation due to those complaints.  In addition, some of Doe's professors and instructors – Professor Rose, Professor Zascek, Professor Patrylo, and Ms. Viscomi – had actual knowledge of Doe's complaints.

684.  Their collective  knowledge is attributable to the Defendants.

685.  The Defendants' repeated and deliberate actions in deliberately failing to act to investigate or remediate any of Doe's allegations were so pervasive and all-encompassing that they left Doe with nowhere to obtain help or relief from Professor Patrylo's predations, and the ensuing acts of retaliation.

686.  Doe was thereby deprived of a safe educational environment in which to study and learn,

687.  The systemic failure to respond to Doe's complaints also deprived her of a fair testing and grading process.  In effect, Defendants permitted her to be selectively targeted for discrimination during exams and to be graded dishonestly after completing her exams.

688.  As a direct result, Doe failed Basic Science during both the second and third units of her second year.

689.  These two alleged failures formed the rational basis for the Committee's vote in July 2013 to dismiss Doe from the medical school.

690.  Each specific unlawful act by the Defendants, in failing to respond to Doe's complaints of sex-based discrimination and/or consequent retaliation ensuing therefrom, violated Title IX and constituted a fresh act of sex-based discrimination against Doe, attributable to Defendants..

Consequently, Doe suffered damages, including:

        a. Psychological damage and emotional distress;

        b. Damage to her reputation;

        c. The loss of two years of tuition and related costs of attending school;

        d. Lost earnings while in school; and

        e. Future lost earnings.

### COUNT III – Hostile Environment Stemming From Sex-Based Discrimination

691.  Plaintiff incorporates ¶¶ 1-690 above, as if fully stated herein.

692.  The acts of sexual harassment, stalking, intimidation, shaming, denial of educational resources, and retaliation triggered by Professor Patrylo, as described in Count I; together with the deliberate indifference of SIU-SOM officials to Doe's complaints, which in some instances also rose to outright harassment, shaming, intimidation, denial of educational resources, and retaliation by SIU-SOM officials, as described in Count II; together created a hostile environment for Doe that remained severe, pervasive, and objectively offensive throughout her two years at SIU-SOM.

693.  This hostile environment absorbed much of Doe's time and energy and caused her severe emotional distress and outright fear for her physical safety.  It interfered with her ability to study, learn, and perform to the best of her ability, and prevented her from enjoying the benefits of her educational opportunities at SIU-SOM.

694. In addition, the hostile environment fostered a group mentality among key members of the Faculty and Administration, in which it was considered morally acceptable to close ranks behind Professor Patrylo by collectively acting to harass, disparage, and intimidate Doe.

695. That group mentality led the Defendants – through key members of the Faculty and Administration – to allow and condone obviously discriminatory treatment targeting Doe in the lab and during exams, culminating in unfair and dishonest grading of her exams.

696. As a result, Doe allegedly "flunked" both the second and third units of her second year, even though she demonstrated a satisfactory understanding of the material being tested, when she took the NBME exam in May 2013..

697. The hostile environment infected the July 2013 Committee hearing, as well. The combined (sex-based) prejudice of three of the Committee members – Dean Constance, Professor Clough, and Dean Herrold – undermined Doe's attempt to explain to the Committee that her alleged "failures" in the second and third units were in fact the result of sex-based discrimination. When Doe presented her claims of pervasive sex-based discrimination to the Committee, Dean Constance, Professor Clough, and Dean Herrold responded by blaming her for what happened .

697. The responses by Dean Constance, Professor Clough, and Dean Herrold were objectively unreasonable, in light of the clear evidence that Doe had been sexually harassed and stalked by Professor Patrylo through most of her two years at SIUC-SOM. But, they had a strong effect upon the Committee.

698. As a result, the Committee voted to dismiss Doe from the medical school. Consequently, Doe suffered damages, including:

 a. Psychological damage and emotional distress;

 b. Damage to her reputation;

 c. The loss of two years of tuition and related costs of attending school;

 d. Lost earnings while in school; and

 e. Future lost earnings.

**WHEREFORE, Doe seeks relief in the form of:**

1. Compensatory damages in excess of $600,000 for:

 a. Tuition and other related costs of attending school;
 b. Lost earnings at an amount commensurate with her prior work experience;
 c. Future lost earnings;

d. Emotional pain and suffering; and

e. Damage to her reputation.

2. Punitive damages;

3. Attorney's fees;

4. Such other damage as this Court sees fit.

Respectfully Submitted
s/Richard Fedder
Attorney for Plaintiff

Richard S. Fedder
ARDC#6272204
921 Cobb Place Manor Dr.
Marietta, Ga.  30066
Telephone: (618) 201-5834
rchfddr@gmail.com